[No. H008944. Sixth Dist. Mar. 8, 1993.]

In re JOSHUA H., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JOSHUA H., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part IIIB.

COUNSEL

Robert R. Riggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver, Joanne S. Abelson and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

Doreena P. Wong, Angelo N. Ancheta, Kathryn K. Imahara, Stanley Mark, Heller, Ehrman, White & McAuliffe, Robert E. Borton, Stephen M. Hankins, Diane T. Chin, Edward M. Chen, Paul Hoffman, Erwin Chemerinsky and Mary Ellen Gale as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

COTTLE, P. J.—

I

INTRODUCTION

In the published portion of this opinion, we are asked to determine whether California's "hate crime" statute[1] violates the First Amendment. Similar statutes in Wisconsin and Ohio were declared unconstitutional by

---

[1]We deal here with Penal Code section 422.7, part of the Tom Bane Civil Rights Act (hereafter the Bane Act) (Civ. Code, § 52.1; Pen. Code, §§ 422.6-422.95). (For further information on the Bane Act, see fn. 9, *post*.)

Penal Code section 422.7, as it read in 1991, provided: "Except in the case of a violation of subdivision (a) or (b) of Section 422.6, any crime which is not made punishable by imprisonment in state prison shall be punishable by imprisonment in state prison or in county jail not to exceed one year, or by fine not to exceed ten thousand dollars ($10,000), or by both the fine and imprisonment, if the crime is committed against the person or property of another for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States, because of the other person's race, color, religion, ancestry, national origin, or sexual orientation, under any of the following circumstances, which shall be charged in the accusatory pleading: [¶] (a) The crime against the person of another either includes the present ability to commit a violent injury or causes actual physical injury. [¶] (b) The crime against property causes damage in excess of one thousand dollars ($1,000). [¶] (c) The person charged with a crime under this section has been previously convicted of a violation of subdivision (a) or (b) of Section 422.6, or has been previously convicted of a conspiracy to commit a crime described in subdivision (a) or (b) of Section 422.6."

their respective supreme courts.[2] As we shall explain, we disagree with those decisions. Hate crime statutes do not run afoul of the First Amendment because they do not proscribe expression. Rather, they proscribe an especially egregious type of *conduct*—that of selecting crime victims on the basis of race, color, religion, ancestry, national origin, or sexual orientation.

In the unpublished portion of this opinion, we address various evidentiary matters.

## II

### FACTS

The H. family—mother, father, two young daughters and 17-year-old Joshua, lived on Guadalupe Street in San Jose. William Kiley, a gay man, lived across the street; he also owned a rental unit next door to the H.'s. In 1988, Kiley's tenant's dog bit Mrs. H. She sued, and as a result, Kiley had to pay damages and his tenant had to have two dogs killed. Animosity between the neighbors was ongoing from that date.

Around June 1990, Kiley bought a lawn mower, which did not have a grass catcher. When he mowed his tenant's lawn, grass clippings would blow onto the H.'s' driveway. This incensed the H.'s. By December 1990, the grass clippings issue became so heated that Kiley stopped mowing the lawn.

In television interviews admitted as evidence at trial, Kiley said the H.'s constantly harassed him because of his sexual orientation. When he contacted an attorney about the harassment, he was told he would need to get proof. He obtained that proof on June 11, 1991.

On that date, Kiley again mowed the lawn at his rental. As he was finishing, Mr. H. came home, looked at Kiley, and said, "You cocksucker, I'm tired of your fucking games." Kiley went into his house and turned on a video camera, which he aimed at his rental. He then returned to the rental and watered the lawn. He also picked up a couple handfuls of grass trimmings from the H's' driveway and put them in a garbage can. There was no response from the H.'s so Kiley returned home and turned off the video camera. Later Joshua appeared at his door, asking if Kiley was "gonna clean up the grass on our driveway." Kiley said he would. He turned the video camera on, went to the backyard of his rental, and watered some more. Then he came home and turned the camera off.

---

[2]See *State* v. *Mitchell* (1992) 169 Wis.2d 153 [485 N.W.2d 807] and *State* v. *Wyant* (1992) 64 Ohio St.3d 153 [597 N.E.2d 450].

Around 6 p.m., Geo Romero and his sister Vickey came over to watch some videos of the San Francisco Gay Pride Parade. Before they began, Kiley went over to the H.'s' driveway and swept grass clippings into the gutter. He did not videotape this.

Around 8 p.m., Kiley's roommate announced that the H.'s had left a "present" for Kiley on the front porch. The "present" was a pile of dirt and grass clippings. Kiley picked up several handfuls, went to the H.'s' house, and threw it on their driveway. One of the H. girls came outside and asked, "Why are you doing this to us?"

Kiley turned the video camera back on and returned to his rental property, watering the lawn once again. Mrs. H. came outside and took pictures of the grass clippings. She told Kiley that all she expected out of him was to be a reasonable neighbor. By 8:08 p.m., tensions were so high that Mr. H. called the police hotline to see what could be done. The police recorded the call, which lasted 12 minutes. After putting Mr. H. on hold several times, police gave him the names and telephone numbers of agencies that might help settle their dispute. At a certain point during this 12-minute conversation, a fight broke out between Joshua and Kiley. At that time the police transferred the call to 911.

The fight was captured on Kiley's videotape.[3] It showed an agitated Joshua dancing around Kiley like a boxer, yelling at him to clean up the grass clippings, and pointing at his driveway for approximately one and one-half minutes. During this time Joshua repeatedly called Kiley a "faggot," "queer," and "punk." He taunted Kiley, "come on, let's get it on you faggot queer." After Kiley ordered Joshua to "[g]et off my property," Joshua hit him. Kiley did not respond at first, but then he squirted Joshua with the hose. Joshua became enraged. He took off his shirt, threw it on the car in his driveway, then came after Kiley, hitting and kicking him several times. Kiley never hit back.

During the altercation, Joshua's mother and sisters came outside, and then his father joined them. Mr. H. said he didn't want to talk to Kiley. Mrs. H., however, called him a "fucking ass hole." As the battered Kiley was returning home, Joshua yelled out, "Where are you going, faggot, you going to suck some faggot dick?"

When Kiley got inside his home, he asked his roommate, "How does it look?" They took the video camera outside and took close-up pictures of Kiley's wounds, which immediately after the incident were not very visible.

---

[3] An audio enhancement of the tape was entered into evidence at trial.

Television interviews several days later, however, showed black eyes and Kiley's neck in a brace.

Following trial, the juvenile court found true all the allegations in the petition, including the allegation that Joshua "did commit a crime in violation of Section 242-243(a) of the California Penal Code against the person and property of another, to wit: William Kiley, for the purpose of intimidating and interfering with William Kiley's free exercise and enjoyment of a right secured to him by the constitution and laws of the State of California and the United States, because of his sexual orientation, and that the foregoing offense included the present ability to commit a violent injury and caused actual physical injury to William Kiley; thereby violating Section 422.7(a) of the Penal Code of the State of California, a felony."

Additional facts will be discussed where relevant.

### III

### DISCUSSION

A. *Is Penal Code Section 422.7 Constitutional?*

Penal Code section 422.7 permits a misdemeanor to be punished as a felony "if the crime is committed against the person or property of another for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States, because of the other person's race, color, religion, ancestry, national origin, or sexual orientation . . . [where] [t]he crime against the person of another either includes the present ability to commit a violent injury or causes actual physical injury."

Joshua contends section 422.7 is void for vagueness for failing to afford adequate notice of the conduct proscribed. We disagree. As Joshua acknowledges, section 422.7 may be saved "by a narrowing construction requiring a specific intent to deprive a person of a defined constitutional or statutory 'right' on account of the person's status as a member of a protected class." (See e.g., *Screws* v. *United States* (1945) 325 U.S. 91, 101, 104 [89 L.Ed. 1495, 1502, 1504, 65 S.Ct. 1031, 162 A.L.R. 1330].) The only California court to examine this code section gave it just such a narrow construction. (See *People* v. *Lashley* (1991) 1 Cal.App.4th 938, 947 [2 Cal.Rptr.2d 629].) The court pointed out that section 422.7 was "modeled after the federal criminal civil rights statute presently codified in 18 United

States Code section 242 and the Massachusetts Civil Rights Act of 1979 . . . ." (*Id.*, at pp. 947, 947-948, fn. 7.)[4] Each of those statutes had been construed to require "a specific intent" "to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." (*Screws* v. *United States, supra,* 325 U.S. 91, 101, 104; see also *Com.* v. *Stephens* (1987) 25 Mass.App.Ct. 117 [515 N.E.2d 606, 609].)

■ Like the statutes after which it was modeled, section 422.7 also requires proof of a specific intent to deprive an individual of a right secured by federal or state law. "This does not mean, however, that the prosecution must show that the defendant acted with knowledge of particular provisions of state or federal law, or that the defendant was even thinking in those terms. It is sufficient if the right is clearly defined and that the defendant intended to invade interests protected by constitutional or statutory authority." (*People* v. *Lashley, supra,* 1 Cal.App.4th at p. 949.)

■ Joshua also contends section 422.7 is overbroad in that it punishes activity protected by the First Amendment—namely, a person's bigoted thoughts. While this issue is raised in this case for the first time in California, it has been raised many times in other states which have hate crime statutes similar to ours.[5] In each case, except the recent Wisconsin and Ohio cases,[6] the courts have upheld the statutes as against First Amendment

---

[4]Title 18 United States Code section 242 provides: "Whoever, under color of law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any terms of years or for life."

The Massachusetts law states in relevant part: "No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States. . . ." (Mass. Ann. Laws, ch. 265, § 37 (Law. Co-op. 1992).)

[5]In 1981, the Anti Defamation League of the B'nai B'rith (ADL) drafted a model "ethnic intimidation statute," which enhances penalties for certain criminal offenses that are committed because of the victim's race, color, religion, sexual orientation or other enumerated status. Since that time, 35 states have adopted ethnic intimidation statutes; most are based on the ADL model but several others, including those of California and Massachusetts, are based on federal civil rights statutes such as 18 United States Code section 242, and on federal antidiscrimination statutes such as 42 United States Code sections 1981, 1982, and 2000e (tit. VII of the Civil Rights Act of 1964).

[6]See footnote 2, *ante.*

challenges.[7] As a New York court explained, "The statute does not attempt to prohibit bigotry itself. The individual's freedom to think, and indeed, speak, publish or broadcast views on the subjects of race, religion or ethnicity are not regulated by this law. Violent conduct is what is being regulated." (*People* v. *Grupe, supra*, 532 N.Y.S.2d at p. 818.) An Oregon court came to the same conclusion: no one "is subject to punishment under the Intimidation Law merely for holding or expressing opinions that are inimical to others because of their race, color, religion, national origin or sexual orientation. The focus of the statute is to forbid a result: physical injury. The fact that speech, writing or conduct may be used to prove unlawful motive does not mean that the statute violates [free speech guarantees]." (*State* v. *Hendrix, supra*, 813 P.2d at p. 1119.) ■ Indeed, as the United States Supreme Court in other contexts has made clear, "The First Amendment does not protect violence" (*NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 916 [73 L.Ed.2d 1215, 1238, 102 S.Ct. 3409]); "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection." (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 628 [82 L.Ed.2d 462, 478, 104 S.Ct. 3244].)

Nevertheless, a divided court in Wisconsin and a unanimous court in Ohio struck down their hate crime statutes as violative of the First Amendment. Relying heavily on a law review article written by Susan Gellman, *Sticks and Stones Can Put You in Jail, but Can Words Increase Your Sentence? Constitutional and Policy Dilemmas of Ethnic Intimidation Laws* (1991) 39 UCLA L.Rev. 333, and to a lesser degree on the recent United States Supreme Court opinion in *R. A. V.* v. *St. Paul* (1992) 505 U.S. __ [120 L.Ed.2d 305, 112 S.Ct. 2538] (hereafter *R. A. V.*), each of these courts determined it was impermissible to enhance punishment of criminals because of their bigoted motives because bigotry is a protected class of expression.

While we agree that bigotry is a protected class of expression, we disagree that the hate crime statutes punish bigotry. Rather, they punish the discriminatory act of selecting a crime victim based on his or her race or other status. In our view, the Wisconsin and Ohio courts misinterpreted *R. A. V.* and erroneously accepted Professor Gellman's suggestion that motive is irrelevant to the determination of guilt. Our analysis follows.

---

[7]See e.g., *Dobbins* v. *State* (Fla.Dist.Ct.App. 1992) 605 So.2d 922; *People* v. *Grupe* (1988) 141 Misc.2d 6 [532 N.Y.S.2d 815]; *People* v. *Miccio* (N.Y. Crim. Ct. 1992) 589 N.Y.S.2d 762; *People* v. *Mulqueen* (Dist. Ct. 1992) 589 N.Y.S.2d 246; *State* v. *Hendrix* (1991) 107 Ore.App. 734 [813 P.2d 1115]; *State* v. *Plowman* (1992) 314 Ore. 157 [838 P.2d 558], certiorari applied for November 23, 1992, Supreme Court Docket No. 92-6702.

1. *The R. A. V.* Decision

In the predawn hours of June 21, 1990, petitioner R. A. V., a juvenile, and other teenagers allegedly burned a cross in an African-American family's yard. (*R. A. V., supra*, 505 U.S. at p. __ [120 L.Ed. 2d at p. 315].) He was charged with, inter alia, a violation of Minnesota's hate crime statute (Minn. Stat. § 609.2231(4) (1992)), but he did not challenge that statute. (*Id.*, at p. __, fn. 2 [120 L.Ed.2d at p. 315, fn. 2.) He was also prosecuted under a St. Paul ordinance that made it a misdemeanor to "place[] on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender . . . ." (*Id.*, at p. __ [120 L.Ed.2d at p. 315].)

R. A. V. challenged the St. Paul ordinance in the trial court, arguing it was substantially overbroad and impermissibly content based and thus facially invalid under the First Amendment. The trial court granted the motion, but the Minnesota Supreme Court reversed. It limited the phrase in the ordinance, " 'arouse *anger, alarm or resentment in others*,' " to conduct amounting to " 'fighting words,' " i.e., " 'conduct that itself inflicts injury or tends to incite immediate violence . . . .' " (*Matter of Welfare of R. A. V.* (Minn. 1991) 464 N.W.2d 507, 510, citing *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766].) As so construed, the ordinance reached only expression that the First Amendment did not protect. The court also determined that the ordinance was not impermissibly content based because it was " 'a narrowly tailored means toward accomplishing the compelling governmental interest in protecting the community against bias-motivated threats to public safety and order.' " (*Matter of Welfare of R. A. V., supra*, 464 N.W.2d at p. 511.)

The United States Supreme Court accepted the Minnesota court's construction of the ordinance as limited to "fighting words," but concluded that it violated the First Amendment nevertheless because it applied only to *specific* "fighting words," i.e., those that insult or provoke violence on the basis of race, color, creed, religion, or gender. The court observed that "[c]ontent-based regulations are presumptively invalid." (*R. A. V., supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 317].) Thus, the court's prior statements that certain categories of expression such as defamation, obscenity, and "fighting words" were " 'not within the area of constitutionally protected speech' "

were not "literally true."[8] (*Id.*, at pp. \_\_-\_\_ [120 L.Ed.2d at pp. 317-318], quoting *Roth* v. *United States* (1957) 354 U.S. 476, 483 [1 L.Ed.2d 1498, 1506, 77 S.Ct. 1304].) Those categories of expression may be regulated but not based on their content.

Under St. Paul's ordinance, displays containing abusive invective, no matter how vicious or severe (aspersions on one's mother, for example), were permissible so long as they were not addressed to one of the specified disfavored topics. Another problem with the ordinance was that it imposed viewpoint discrimination in addition to content discrimination: "One could hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.' " (*R. A. V.*, *supra*, 505 U.S. at p. \_\_ [120 L.Ed.2d at p. 323].) While the court agreed the ordinance promoted a compelling state interest in insuring the basic human rights of members of groups that have historically been subjected to discrimination (*id.*, at p. \_\_ [120 L.Ed.2d at p. 325]), it determined that the content discrimination in the ordinance was "plainly" not reasonably necessary to achieve these compelling state interests. (*Id.*, at p. \_\_ [120 L.Ed.2d at p. 326].)

The court recognized exceptions to the First Amendment prohibition of content discrimination but concluded that St. Paul's ordinance did not fall within any of them. The first exception was "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable . . . ." In that situation "no significant danger of idea or viewpoint discrimination exists." (*R. A. V.*, *supra*, 505 U.S. at pp. \_\_-\_\_ [120 L.Ed.2d at pp. 320-321].) The court gave as examples (1) prohibitions against only that obscenity which is the most patently offensive in its prurience, (2) criminalization of only those threats of violence which are directed against the President of the United States, and (3) regulation of price advertising in one industry but not others, where, in the state's view, the risk of fraud is greater. (*Id.*, at p. \_\_ [120 L.Ed.2d at p. 321].)

A second "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is '*justified* without reference to the content of the . . . speech

---

[8]In his concurrence, Justice White, joined by Justices O'Connor and Blackmun, criticized the majority for announcing "that earlier Courts did not mean their repeated statements that certain categories of expression are 'not within the area of constitutionally protected speech.' " (*R. A. V.*, *supra*, 505 U.S. at p. \_\_ [120 L.Ed.2d at p. 329].) That group of justices, plus Justice Stevens, would have invalidated St. Paul's ordinance instead on the ground it was overbroad. But for this infirmity, the ordinance would have been a valid regulation of unprotected speech for purposes of the Fourteenth Amendment equal protection clause.

. . . .' [Citation.]" (*R. A. V.*, *supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 321].) For example, a state could permit all obscene live performances except those involving minors. (*Ibid.*) Under this exception, "a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute *directed at conduct, rather than speech.*" (*Id.*, at p. __ [120 L.Ed.2d at p. 322]; italics added.) Thus, telling the enemy the government's defense secrets violates a law against treason. Similarly, sexually derogatory "fighting words" may produce a violation of the general prohibition against sexual discrimination in employment practices under title VII of the Civil Rights Act of 1964 (42 U.S.C § 2000e-2). (*Ibid.*)

The last exception concerns selective restriction where "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." (*R. A. V.*, *supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 322].)

### 2. *Penal Code Section 422.7 Is Valid Under R. A. V.*

As noted above, R. A. V. did not challenge his conviction under the Minnesota equivalent of section 422.7. (*R. A. V.*, *supra*, 505 U.S. at p. __, fn. 2 [120 L.Ed.2d at p. 315, fn. 2].) He challenged only the St. Paul ordinance, which prohibited the use of symbols to convey a message. Specifically, it regulated "fighting *words* that contain . . . *messages* of 'bias-motivated' hatred and . . . *messages* 'based on virulent notions of racial supremacy.' " (*Id.*, at p. __ [120 L.Ed.2d at p. 323], quoting *Matter of Welfare of R. A. V.*, *supra*, 464 N.W.2d at p. 511, italics added.) Because the ordinance regulated "words" and "messages," i.e., pure or symbolic speech, it clearly implicated the First Amendment: "Congress [and the states through the Fourteenth Amendment] shall make no law abridging the freedom of speech."

The hate crime statutes, in contrast, do not regulate speech; they regulate acts of violence intended to interfere with the victim's protected rights. There is a fundamental difference under the First Amendment between speech and conduct, especially violent conduct: "The First Amendment does not protect violence." (*NAACP* v. *Claiborne Hardware Co.*, *supra*, 458 U.S. 886, 916 [73 L.Ed.2d 1215, 1238].)

Of course, the distinction between speech and conduct is not as clear-cut as the last paragraph suggests. Some conduct is so "expressive" that it is entitled to First Amendment protection. Examples include flag desecration and burning (*Texas* v. *Johnson* (1989) 491 U.S. 397 [105

L.Ed.2d 342, 109 S.Ct. 2533]), displaying of a red flag (*Stromberg* v. *California* (1931) 283 U.S. 359 [75 L.Ed. 1117, 51 S.Ct. 532, 73 A.L.R. 1484]), wearing of black armbands to show opposition to war (*Tinker* v. *Des Moines School District* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]), draft card burning (*United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 679, 88 S.Ct. 1673]), and peaceful demonstration or picketing (*Thornhill* v. *Alabama* (1940) 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736]). To be protected as "expressive conduct," the activity must be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments, for as the court noted in *United States* v. *O'Brien* (1968) 391 U.S. 367, 376 [20 L.Ed.2d 672, 679, 88 S.Ct. 1673], " '[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.' " (*Spence* v. *Washington* (1974) 418 U.S. 405, 409 [41 L.Ed.2d 842, 846, 94 S.Ct. 2727].)

 The violent conduct proscribed by section 422.7 is not, in our view, sufficiently imbued with elements of communication to be labeled "speech." In this case, for example, there is no indication Joshua intended to convey a message to anyone when he assaulted and battered his victim. As Justice Bablitch observed in his dissent to the Wisconsin case, *State* v. *Mitchell*, *supra*, 485 N.W.2d at page 820: "The statute does not impede or punish the right of persons to have bigoted thoughts or to express themselves in a bigoted fashion or otherwise, regarding the race, religion, or other status of a person. . . . What the statute does punish is acting upon those thoughts. It punishes the act of discriminatory selection plus criminal conduct, not the thought or expression of bigotry. The Constitution allows a person to have bigoted thoughts and to express them, but it does not allow a person to act on them."

 Even if we accepted, which we do not, the Wisconsin and Ohio courts' premise that hate crime statutes enhance penalties based on the perpetrator's bigoted thoughts, which are protected by the First Amendment, hate crime statutes would still pass constitutional muster under the *R. A. V.* exceptions discussed above. First, "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." (505 U.S. at pp. ___-___ [120 L.Ed.2d at pp. 320-321].) The "basis" for punishing violent crimes directed against members of a racial, religious, or other specified group more severely than randomly inflicted violent crimes is that such crimes inflict greater injury upon the victim and society at large and existing criminal statutes and penalties have been

inadequate to stop them.[9] This is "the very reason" those particular acts of violence are additionally punishable.

Second, "according differential treatment to" those who select their victims on the basis of race or other protected status is permissible because the differential treatment "happens to be associated with particular 'secondary effects' of the speech, so that the regulation is '*justified* without reference to the content of the . . . speech.' [Citation.]" (*R. A. V.*, *supra*, 505 U.S. at p.

---

[9]We have taken judicial notice, on the motions of amici curiae (The San Francisco Lawyers' Committee for Urban Affairs and The National Asian Pacific Legal Consortium et al.), the Attorney General of the State of California, and Joshua, of numerous studies and reports on the incidence of hate crimes across the nation and in California and of the legislative history of the Bane Act.

The studies indicate that hate crimes are at an "all-time high." (Freedom From Fear— Ending California's Hate Violence Epidemic, Final Report of the Lieutenant Governor's Commission on the Prevention of Hate Violence (May 1992), p. 1.) For example, in 1991 in Los Angeles there was a 22 percent increase in hate crimes over 1990, including 147 incidents directed at gay men, 20 at lesbians, 130 at African-Americans, 130 at Jews, 67 at Latinos, 54 at Asian-Americans, and 22 at Arab-Americans. Attacks against Jews increased by 34 percent; those against gays and lesbians by 50 percent. California's lieutenant governor characterized this trend as "an epidemic of hate violence." (*Id.* at p. 2.)

The studies also show that hate crimes are more serious than conventional crimes. For example, while 10 percent of conventional crimes involve physical assault (the remaining 90 percent being directed against property), 30 percent of hate crimes do. (B. Levin, A Practical Approach to Bias Crimes for Police (1992); Hate Crimes in Massachusetts—Preliminary Annual Rep.—Jan.-Dec., 1990.) Additionally, injuries inflicted during hate crime assaults are more severe: 74 percent result in physical injury and 30 percent in hospitalization while the comparable figures for non-bias-based assaults are 29 percent and 7 percent. (J. McDevitt, The Study of the Character of Civil Rights Crimes in Massachusetts, 1983-1987 (1989).) The severity of the injuries is attributable in part to the fact that hate crimes are more likely to be committed by multiple offenders than are conventional crimes. (B. Levin, A Practical Approach to Bias Crimes for Police, *supra.*) They also are more likely to be committed by strangers than are non-bias-based crimes (85 percent of the time versus 60 percent). (*Ibid.*) Sixty-five percent of the victims are attacked on more than one occasion. (P. Ephross et al., The Ethnoviolence Project-Pilot Study.) Reports show that victimization on the basis of an *immutable characteristic or protected status has a more debilitating effect on the victim and on members in the victim's community* than does conventional crime: victims fear a recurrence and experience an increased sense of vulnerability, isolation, and injustice. " 'For the co-victim, attacks on their peers are seen as danger signals to the entire group, as well as potential threats to their personal well-being.' " (San Francisco Lawyers' Committee for Urban Affairs amicus brief, quoting Campus Ethnoviolence, National Institute Against Prejudice & Violence, Report No. 5 (1992), at p. 11.)

The Bane Act and related California statutes dealing with discriminatory threats and violence (e.g., Civ. Code, § 51.7 (Ralph Civil Rights Act); Pen. Code, §§ 190.2, 302, 594.1, 594.3, 1170.75-1170.85, 11410-11413, 11460, and Gov. Code, § 6254, subd. (f)(2)) are California's response to this alarming increase in hate crimes. It was the " 'inadequacy of existing law and the increase in crimes committed because of the victim's minority status' " that prompted the Legislature to enact the Bane Act. (National Asian Pacific American Legal Consortium et al. amicus brief, quoting Sen. Com. on Judiciary Rep., as amended June 26, 1987, p. 3 (1987-1988 Reg. Sess.).)

___ [120 L.Ed.2d. at p. 321], italics in original.) The court cited antidiscrimination laws such as 42 United States Code sections 1981, 1982, and 2000e-2 and 18 United States Code section 242, after which Penal Code section 422.7 is modeled (*People* v. *Lashley, supra,* 1 Cal.App.4th at p. 947), as examples of laws consistent with the First Amendment principle that "[w]here the government does not target conduct on the basis of its expressive content, *acts* are not shielded from regulation merely because they express a discriminatory idea or philosophy." (505 U.S. at p. ___ [120 L.Ed.2d at p. 322] italics added.)

Penal Code section 422.7 is indistinguishable from other antidiscrimination laws: both make it an offense to undertake an *act* "because of" the victim's race or other status. While racism or bigotry may typically be involved in these situations, it is the *act* of discrimination and differential treatment based on race or other status—not the thought behind the act— which is proscribed. We find the Ohio and Wisconsin Supreme Courts' attempts to distinguish hate crime laws from antidiscrimination laws singularly unpersuasive. As Justice Bablitch explained in his eloquent dissent in *State* v. *Mitchell, supra,* 485 N.W.2d 807, 820: "Today the majority decides that the same Constitution which does not protect discrimination in the marketplace does protect discrimination that takes place during the commission of a crime. Numerous federal and state laws exist which prohibit discrimination in the selection of who is to be hired, or fired, or promoted. No one seriously (at least until today) questions their constitutionality. Yet the majority today gives constitutional protection to discrimination in the selection of who is to be the victim of a crime. Both sets of laws involve discrimination, both involve victims, both involve action 'because of' the victim's status. [¶] The majority says there is a difference in the two types of laws. They are wrong. There is no support in law or logic for their position. How can the Constitution not protect discrimination in the selection of a victim for discriminatory hiring, firing, or promotional practices, and at the same time protect discrimination in the selection of a victim for criminal activity? How can the Constitution protect discrimination in the performance of an illegal act and not protect discrimination in the performance of an otherwise legal act? How can the Constitution not protect discrimination in the marketplace when the action is taken 'because of' the victim's status, and at the same time protect discrimination in a street or back alley when the criminal action is taken 'because of' the victim's status?"

Finally, Penal Code section 422.7 complies with the third *R. A. V.* exception to content-based restrictions: "there is no realistic possibility that official suppression of ideas is afoot." (505 U.S. at p. ___ [120 L.Ed.2d at p. 322.) One is free to think, speak, publish and even advocate racist, sexist, anti-Semitic, antigay, or other bigoted ideas without running afoul of Penal Code section 422.7.

▉ Penal Code section 422.7 targets discriminatory conduct, not speech, and therefore falls outside the rule and within the exceptions set forth by *R.A.V.* The statute is accordingly valid under the First Amendment.

### 3. *Can Criminal Motive Be Considered in Determining Guilt?*

The Wisconsin and Ohio courts also found fault with their hate crime statutes for punishing "motive." Both agreed that "intent" could be made an element of a crime but "motive" could not. The courts' reasoning was based in large part on Professor Gellman's law review article, *Sticks and Stones Can Put You in Jail, but Can Words Increase Your Sentence? Constitutional and Policy Dilemmas of Ethnic Intimidation Laws, supra,* 39 UCLA L.Rev. 333. The Wisconsin court quoted from her article: " 'Motive,' 'intent,' and 'purpose' are related concepts in that they all refer to thought processes. They are legally distinct in crucial respects, however. Motive is nothing more than an actor's reason for acting, the 'why' as opposed to the 'what' of conduct. Unlike purpose or intent, motive cannot be a criminal offense or an element of an offense." (*State* v. *Mitchell, supra,* 485 N.W.2d at p. 813, fn. 11.) The Ohio court also relied on an argument made by LaFave and Scott, 1 Substantive Criminal Law (1986) 318, section 3.6, that "if defined narrowly enough, motive is not relevant to substantive criminal law . . . ." (*State* v. *Wyant, supra,* 597 N.E.2d at p. 453.)

▉ Each court determined that "motive" was what was being punished by their respective hate crime statutes,[10] that motive could not be an element of a criminal offense, and that the statutes were therefore invalid. We disagree.[11]

As amicus curiae, The American Civil Liberties Union (ACLU), points out, the Wisconsin and Ohio courts' "enslavement to labels makes little or no sense in either logic or constitutional policy. 'Intent' and 'motive' as used by the court to distinguish between the 'what' and the 'why' of the crime are relative rather than absolute concepts, the definition of which turns simply on where one chooses as a starting point. Professor Gellman's example of the crime of burglary discussed in footnote 11 of the *Mitchell* opinion

---

[10]The Ohio court found that "the enhanced penalty results solely from the actor's reason for acting, or his motive." (*State* v. *Wyant, supra,* 597 N.E.2d at p. 453.) The Wisconsin court decided that "the actor's motive or reason for singling out the particular person against whom he or she commits a crime" was what was being punished by its statute. (*State* v. *Mitchell, supra,* 485 N.W.2d at p. 813.)

[11]Joshua concedes, as did the Wisconsin and Ohio courts, that a defendant's so-called "hate" motivation may properly be considered in sentencing. (See e.g., *Barclay* v. *Florida* (1983) 463 U.S. 939, 949 [77 L.Ed.2d 1134, 1143-1144, 103 S.Ct. 3418]; *Dawson* v. *Delaware* (1992) 503 U.S. __, __ [117 L.Ed.2d 309, 316, 112 S.Ct. 1093].) However, he argues that motive may not be used as an element of a substantive criminal offense.

illustrates the point. Breaking and entering could be the 'what' of the crime and the perpetrator's purpose of taking property could be the 'why.' Under that construct, the burglar's 'motive' is relevant to the crime charged. Alternatively, breaking and entering for the purpose of taking property could be defined as the 'what' and the desire to obtain money to pay debts the 'why.' In that case, the burglar's 'motive' is irrelevant. There is no reason why one construct is *a priori* more correct than the other."

■ Additionally, it is not true that an actor's reason for acting is never relevant in criminal or civil law. The same conduct may be punished differently depending on the *reason* the defendant acted, i.e., the defendant's mental state, or mens rea. For example, a homicide may be charged as first degree murder, second degree murder, voluntary manslaughter, or involuntary manslaughter, or it may be excused altogether, depending on the perpetrator's motive. Another example is breaking and entering, which is punished more severely if done to commit a felony (Pen. Code, § 459); yet another example is kidnapping, which is punished more severely where the kidnapping is done to commit a sex crime (Pen. Code, § 208, subd. (d)).

■ Motive is also relevant in the antidiscrimination laws. The same act (e.g., refusing to rent to an African-American) is permissible if based on the applicant's poor credit history but is not if based on the applicant's race. (See 42 U.S.C. §§ 1981 and 1982.) "Antidiscrimination statutes do not," Justice Bablitch pointed out, "prohibit a person from not hiring someone of a protected class, they prohibit a person from not hiring someone of a protected class *because* or *on the basis of* his or her protected class." (*State* v. *Mitchell, supra,* 485 N.W.2d at p. 823, italics in original.)

The critical inquiry, amicus curiae ACLU suggests, is: "does the government have a legitimate interest in distinguishing one act from another on the basis of the element at issue, whether the element be labeled 'intent' or 'motive'?" In the case of burglary, "[t]he government has a legitimate interest in making burglary a more serious offense than trespass because breaking and entering to take another's property is more injurious than breaking and entering to recover one's own property."

In the case of hate crime legislation, the government has a legitimate and even compelling interest in distinguishing between acts of violence randomly committed and acts of violence committed because the victim is a member of a racial, religious or other protected group. (See generally, fn. 9, *ante.*) It is the *selection* of a victim because of his or her race or other status, not the *reason* for that selection (intolerance, xenophobia, vengeance, fear, to impress others, and so forth) that triggers the additional punishment imposed

by the hate crime statutes. Whether the perpetrator's intentional selection is denominated his or her "intent" or his or her "motive," it is relevant and may properly be considered in determining guilt.

### 4. *Is Penal Code Section 422.7 Overbroad?*

In *State* v. *Mitchell*, the Wisconsin Supreme Court held its hate crime statute was unconstitutionally overbroad because "use of the defendant's speech, both current and past, as circumstantial evidence to prove the intentional selection, makes it apparent that the statute sweeps protected speech within its ambit and will chill free speech." (485 N.W.2d at pp. 815-816.) We disagree. " '[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.' [Citation.]" (*Cox* v. *Louisiana* (1965) 379 U.S. 559, 563 [13 L.Ed.2d 487, 491-492, 85 S.Ct. 476].)

The Oregon Supreme Court explicitly rejected the reasoning of the Wisconsin court in finding the Oregon hate crime statute not overbroad. (*State* v. *Plowman, supra,* 838 P.2d at pp. 564-565.) It noted: "First, [the enhancement] need not be proved by speech or associations. For example, if the state showed that every Saturday night for two months the defendants traveled to an area with a large Hispanic population and assaulted a Hispanic person, the trier of fact could infer that the defendants intended to cause physical injury to the present victim because he is perceived to be Hispanic. [¶] Second, there is a distinction between making speech the crime itself, or an element of the crime, and using speech to prove the crime. . . . [¶] Speech is often used to prove crimes that do not proscribe speech, particularly the intent element of those crimes. For example, if an assailant grabs a woman's arm and strikes her, stating 'I am going to kill you,' the state can use the assailant's words to prove the crime of attempted murder, because the words reveal the necessary intent. . . . But the words themselves are not an element of the crime of attempted murder; they simply make the required intent manifest."

Justice Bablitch noted in his *Mitchell* dissent that "[i]t is no more chilling of free speech to allow words to prove the act of intentional selection in this 'intentional selection' statute than it is to allow a defendant's words that he 'hated John Smith and wished he were dead' to prove a defendant intentionally murdered John Smith." (*State* v. *Mitchell, supra,* 485 N.W.2d at p. 822.) Speech may also be used to prove violations of antidiscrimination and fair housing discrimination laws. (*Id.,* at p. 823.)

██ Although a defendant's words may be used to prove he or she intentionally selected the victim on the basis of the victim's status, "the state cannot use evidence that the defendant has bigoted beliefs or has made bigoted statements *unrelated* to the particular crime. . . . The statute requires the state to show evidence of bigotry relating *directly* to the defendant's intentional selection of this particular victim upon whom to commit the charged crime. The state must directly link the defendant's bigotry to the invidiously discriminatory selection of the victim and to the commission of the underlying crime." (*State* v. *Mitchell, supra,* 485 N.W.2d at pp. 818-819 (dis. opn. of Abrahamson, J.), italics added.) Moreover, these elements must be proven beyond a reasonable doubt. (*Ibid.*; see also Welf. & Inst. Code, § 701.)

██ "Where the statute in question is narrowly drawn to protect a legitimate state interest, and proscribes conduct and not purely speech, the overbreadth of the statute 'must not only be real, but substantial as well, judged in relation to the statute's legitimate sweep.' " (*People* v. *Hernandez* (1991) 231 Cal.App.3d 1376, 1381 [283 Cal.Rptr. 81], quoting *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 615[37 L.Ed.2d 830, 842, 93 S.Ct. 2908].) "Only a statute that is substantially overbroad may be invalidated on its face." (*Houston* v. *Hill* (1987) 482 U.S. 451, 458 [96 L.Ed.2d 398, 410, 107 S.Ct. 2502].)

██ Penal Code section 422.7 is narrowly drawn to protect a compelling state interest and is not substantially overbroad. Any prospect of a "chilling effect" on speech is particularly remote in the instant case given that neither words nor associations are subject to any sort of punishment. One is free to speak, publish, or even advocate racist and bigoted ideas and philosophies without sanction. The speaker's words become relevant only if at some later date he or she commits a violent criminal act against another because of the other person's race, sexual orientation, or other status. Under these circumstances, we hold that Penal Code section 422.7 is not unconstitutionally overbroad.

B. *Issues Related Only to the Facts of This Case**

. . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1734.

## IV

### DISPOSITION

The judgment is affirmed.

Premo, J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 24, 1993.