[No. F035083. Fifth Dist. Jan. 29, 2001.]

In re MICHAEL M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL M., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 3 of Discussion.

## COUNSEL

Camela J. McLaren, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stephen G. Herndon and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THAXTER, J.**—Michael M., a minor (appellant) appeals from a juvenile court order sustaining a Welfare and Institutions Code section 602 petition charging him with five misdemeanor counts, consisting of two counts of violating Penal Code section 422.6, subdivision (b),[1] two counts of vandalism causing damage under $400 in violation of section 594, subdivision (a), and one count of possession of tools to commit vandalism or graffiti in violation of section 594.2, subdivision (a).

At a contested disposition hearing the court set the maximum confinement at one year four months, with credit for six days served. Appellant was adjudged a ward of the juvenile court and placed under the supervision of the probation officer until February 18, 2001, subject to stated terms and conditions, including 30 days of electronic monitoring and 200 hours of community service.

Appellant challenges the court's finding that he violated section 422.6, subdivision (b) when he wrote racially motivated words on a classroom door and a building at a public school. His argument raises questions of whether the defaced surfaces were "property of" a particular teacher and a particular group of students at the school, within the meaning of section 422.6, subdivision (b). As discussed below, we conclude the trial court properly interpreted and applied the statute and that the judgment is supported by substantial evidence.

### FACTS

On September 26, 1999, appellant used a permanent black marking pen and wrote the word "Nigger" on the classroom door of the only African-American teacher at his school. On the same date, appellant used a black marking pen to write "Kill the Niggers" on the music building of the school.

---

[1] All further statutory references will be to the Penal Code unless otherwise stated.

The teacher testified that she discovered the word "Nigger" on her classroom door on the morning of September 27, 1999. She was shocked, belittled and "almost moved to tears" by the graffiti. She was somewhat apprehensive about going into her classroom. In her experience, the word "Nigger" connoted "a little bit" of violence, and she had some family members who had been exposed to violent situations in which the word had been used in connection with their race and color. The victim stated she consulted with a relative who advised her for her own safety to leave school before dusk and not go to the school alone on the weekend.

The vice-principal testified there were about 10 or 12 African-American students who congregated near the music building before school each morning after they were dropped off by the bus. The graffiti was written on a concrete post of an awning covering the steps to the music building.

Police Detective Joseph Elerick interviewed appellant at the school office on September 27, 1999. Detective Elerick told appellant he was not under arrest, but that he was investigating the vandalism that had occurred at the school. Appellant first told the officer he remembered hearing about someone writing the word "Nigger" on a teacher's door, but denied he was involved. Detective Elerick told appellant there were high-tech video cameras installed at the school. Detective Elerick asked appellant if he played the videotape, "who would it show . . . writing the word 'Nigger' on the teacher's door?" Appellant began to cry and said, " 'it would show me because I'm the one who wrote Nigger and kill the Niggers.' "

Appellant told Detective Elerick he had had problems with African-American students "pushing him around, kind of bullying him." Appellant said he did not like African-Americans because he was being pushed around by them. Appellant acknowledged that he knew the victim as an "advisory teacher." Detective Elerick testified that Kenny R. had told him several African-American people had walked by Kenny and appellant, and appellant had said, "those stupid Niggers."

## DISCUSSION

1. *The finding that the school's door and wall were property of the victims pursuant to section 422.6, subdivision (b) was supported by substantial evidence.*

Section 422.6, subdivision (b) provides in pertinent part: "No person . . . shall knowingly deface, damage, or destroy the real or personal property of any other person for the purpose of intimidating or interfering with the free

exercise or enjoyment of any right or privilege secured to the other person by the Constitution or laws of this state or by the Constitution or laws of the United States, because of the other person's race . . . ."

■■■ Appellant contends there was insufficient evidence to sustain the court's finding that the school door and concrete post were the property of the victims, as described in the statute. Rather, he claims they were the property of the school.

Appellant's argument assumes that the phrase "property of any other person" in section 422.6, subdivision (b) requires that the defaced, damaged, or destroyed property be owned by the targeted victims. This assumption raises an issue of statutory interpretation which we must address before considering the sufficiency of evidence in this case.

STATUTORY INTERPRETATION

Appellant offers little argument addressing the statutory interpretation issue other than to state that a reading of section 422.6, subdivision (b) to encompass a door and post at a public school as "property" of the victims would "unreasonably expand[] the intent and purpose of the hate crime statutes . . . ." We analyze his contention in light of well-established principles.

■■■ The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution each guarantee no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires "a reasonable degree of certainty in legislation, especially in the criminal law . . . ."[2] "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[3]

In order for a criminal statute to satisfy the dictates of due process, two requirements must be met. First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed.[4]

---

[2]*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].

[3]*Kolender v. Lawson* (1983) 461 U.S. 352, 357 [103 S.Ct. 1855, 1858, 75 L.Ed.2d 903]; see also *Burg v. Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732].

[4]*People v. Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389 [250 Cal.Rptr. 515, 758 P.2d 1046].

Vague laws trap the innocent by not providing fair warnings.[5] Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement.[6]

" 'A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' [Citation.]"[7] "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding. [Citations.]"[8]

█ The " 'fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.]' [Citation.] In determining this intent, courts look first to the words contained in the statute, giving them their usual and ordinary meaning."[9] However, " ' "[The] language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' "[10] "Statutory language must be read in context, keeping in mind the nature and purpose of the enactment, and must be given such interpretation as will promote rather than defeat the objective of the law. [Citation.]"[11]

█ Appellant seems to argue that section 422.6, subdivision (b) applies only to property owned by the victim. We disagree.

Applying the foregoing principles, we look first to the words used in the statute, i.e., "No person . . . shall knowingly deface, damage, or destroy the real or personal *property of any other person* for the purpose of intimidating or interfering with the free exercise or enjoyment of any right or privilege secured *to the other person* . . . ."[12] Clearly, this language requires some connection between the property which is defaced, damaged, or destroyed and the person who is targeted because of race, color, religion, etc. It does not, however, expressly require any particular ownership interest in the property.

---

[5]*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222].

[6]*People v. Superior Court (Caswell), supra,* 46 Cal.3d at page 390.

[7]*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852].

[8]*Smith v. Peterson* (1955) 131 Cal.App.2d 241, 246 [280 P.2d 522, 49 A.L.R.2d 1194].

[9]*People v. Hull* (1991) 1 Cal.4th 266, 271 [2 Cal.Rptr.2d 526, 820 P.2d 1036].

[10]*Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014]; *People v. Hull, supra,* 1 Cal.4th at page 274.

[11]*Clinton v. County of Santa Cruz* (1981) 119 Cal.App.3d 927, 933 [174 Cal.Rptr. 296].

[12]Section 422.6, subdivision (b), italics added.

The preposition "of" has several accepted meanings, including "belonging to," "having," and "possessing."[13] Those terms, when used in reference to property, may imply ownership, but they may also imply possession or occupation.[14]

In common usage we often refer to particular property as "John's office" or "Barbara's classroom" or "Terry's parking space" even though the person has no ownership interest in it. The wording used by the Legislature in section 422.6, subdivision (b) does not preclude its application to such situations.

When we consider the nature and purpose of the statute, we become more convinced that the Legislature did not intend the restrictive interpretation urged by appellant. Section 422.6 is part of the Tom Bane Civil Rights Act (the Bane Act), consisting of Civil Code section 52.1 and sections 422.6-422.95. The Bane Act and related California statutes dealing with discriminatory threats and violence[15] are California's response to the alarming increase in hate crimes. It was the "inadequacy of existing law and the increase in crimes committed because of the victim's minority status" that prompted the Legislature to enact the Bane Act.[16] As explained in *In re M.S.*,[17] it was the expressed desire of the Legislature "to afford greater protection to disfavored minority groups" by adopting the Bane Act.

In urging gubernatorial approval of the Bane Act, its author referred to a report issued by the Los Angeles County Commission on Human Relations noting the increase of acts of racial violence and religious incidents in Los Angeles County during 1986 and stated that the Bane Act "addresses this problem."[18] The commission's report described numerous racially or religiously motivated incidents, several of which involved graffiti on school buildings, walkways, signs, and classroom doors.[19]

Nothing in the language of section 422.6, subdivision (b) or in the legislative history of the Bane Act suggests the Legislature intended for the

---

[13]Webster's Third New World Dictionary (college ed. 1988) page 940.

[14]Webster's Third New World Dictionary, *supra*, at pages 128, 618, 1054.

[15]See, e.g., Civil Code section 51.7 (Ralph Civil Rights Act); Penal Code sections 190.2, 302, 594.3, 1170.75-1170.85, 11410-11413, 11460; and Government Code section 6254, subdivision (f)(2).

[16]Senate Committee on the Judiciary, Report on Assembly Bill No. 63 (1987-1988 Reg. Sess.), as amended June 26, 1987, page 3; see also *In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1748, footnote 9 [17 Cal.Rptr.2d 291].

[17]*In re M.S.* (1995) 10 Cal.4th 698, 711 [42 Cal.Rptr.2d 355, 896 P.2d 1365].

[18]Assemblyman Tom Bane, letter to Governor George Deukmejian, September 17, 1987.

[19]Los Angeles County Board of Supervisors, report of the Los Angeles County Commission on Human Relations (Feb. 1987) Racially and Religiously Motivated Vandalism and Violence in Los Angeles County in 1986, pages 13-23.

application of that provision to turn on questions of property ownership. Instead, the principal thrust of the statute is toward preventing the intimidation of a victim, or the interference with the victim's civil rights, when the intimidation or interference is based on the victim's actual or perceived protected characteristic. Giving the statute the narrow interpretation urged by appellant could lead to results which frustrate, rather than promote, the law's purpose. For example, assume that a public school teacher regularly and openly parks his or her vehicle in a designated space on the school grounds. If a person defaces the car with offensive graffiti referring to the teacher's race, religion, etc., a violation of section 422.6, subdivision (b) may have occurred. But if the same person placed the same graffiti on the teacher's parking space, even while the car may be parked therein, there would be no violation even though the actor's purpose and the intimidating effect of the act were the same as in the first case.

We conclude that the phrase "property of any other person" in section 422.6, subdivision (b) does not require that the victim own the property. As long as the property is regularly and openly used, possessed, or occupied by the victim so that it is readily identifiable with him or her, it falls within the statutory scope.

### Sufficiency of Evidence

■ In reviewing appellant's insufficiency of evidence argument, we ask not whether there is evidence from which the trier of fact could have reached some other conclusion, but whether, viewing the evidence in the light most favorable to respondent, and presuming in support of the judgment the existence of every fact the trier reasonably could deduce from the evidence, there is substantial evidence of appellant's guilt, i.e., evidence that is credible and of solid value, from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.[20] Thus, our sole function as a reviewing court in determining the sufficiency of the evidence is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[21] This same standard of review is applicable to juvenile appeals.[22]

■ Here the evidence showed that the word "Nigger" was written on the door of the classroom of the only African-American teacher at the school. Detective Elerick testified that appellant admitted he knew an African-American teacher taught in that room. Based on our construction of the

[20]*People v. Guardado* (1995) 40 Cal.App.4th 757, 761 [47 Cal.Rptr.2d 81].
[21]*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].
[22]*In re Cheri T.* (1999) 70 Cal.App.4th 1400, 1404 [83 Cal.Rptr.2d 397].

statutory language, we have no difficulty in concluding that a trier of fact could reasonably conclude that the classroom, which was regularly and openly used and occupied by the African-American teacher and was readily identifiable with her, was her property.

Whether the music building was property of the African-American students who congregated there is a closer question, but we reach the same conclusion. The vice-principal testified that 10 to 12 African-American students sit in that area each morning after getting off the bus. The graffiti was written "exactly" in the "particular area" in which the African-American students sat. He explained that high school students "are real territorial and they like their spot." Again, a reasonable trier of fact could find from this evidence that the music building area was regularly and openly occupied by the African-American students so as to be readily identifiable with them.

There is sufficient evidence to support the court's finding that the defaced property was that of the victims.

2. *The trial court did not give section 422.6, subdivision (b) an overbroad interpretation in violation of the First Amendment.*

Appellant contends the trial court's interpretation of section 422.6, subdivision (b) is overbroad and in violation of the First Amendment to the United States Constitution. Specifically, appellant contends the words written on the classroom door and school building did not constitute a credible threat of violence, and therefore his actions were protected by the First Amendment.

An overbreadth challenge implicates the constitutional interest in due process of law.[23] "Statutory overbreadth, as distinct from the related and occasionally overlapping concept of statutory vagueness, is a defect by which a statute, seeking to regulate an area of state interest, reaches too far and punishes innocent behavior."[24] The overbreadth doctrine provides "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."[25] A facial overbreadth challenge is difficult to sustain. To justify a conclusion of facial

---

[23]United States Constitution, Fifth and Fourteenth Amendments; California Constitution, article I, sections 7, subdivision (a), and 24.

[24]*People v. Gudger* (1994) 29 Cal.App.4th 310, 316 [34 Cal.Rptr.2d 510].

[25]*NAACP v. Alabama* (1964) 377 U.S. 288, 307 [84 S.Ct. 1302, 1314, 12 L.Ed.2d 325].

overbreadth, the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.[26] " '[I]t is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citation.]' "[27]

Section 422.6, subdivision (b) does not contain the words "threat of force" as does subdivision (a). Rather, subdivision (b) specifically states, "No person, . . . shall knowingly deface, damage, or destroy the real or personal property of any other person for the purpose of intimidating or interfering with the free exercise or enjoyment of any right or privilege . . . ." However, a statute is not to be read in isolation, but rather " ' "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' "[28] We must also consider the object to be achieved and the evil to be prevented by the legislation.[29]

In *R. A. V. v. St. Paul*,[30] the Supreme Court invalidated, as impermissibly content and viewpoint based, a St. Paul, Minnesota ordinance providing as follows: " 'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.' "

The California Supreme Court extensively discussed *R. A. V. v. St. Paul* in *In re M.S.* The court stated:

"Content-based regulations of speech, the high court observed are presumptively invalid. [Citation.] The rationale of this general prohibition is that content discrimination ' "rais[es] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." ' [Citation.] First Amendment jurisprudence, however, has recognized certain categories of speech (e.g., obscenity, fighting words, threats and defamation) as lacking the full extent of constitutional protection and thus regulable for reasons related to their constitutionally proscribable content. [Citation.] In these contexts of proscribable speech, the prohibition against content discrimination is not absolute. [Citation.] When the nature of a particular

[26]*In re M.S.*, *supra*, 10 Cal.4th at page 710; *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 615 [93 S.Ct. 2908, 2917-2918, 37 L.Ed.2d 830].
[27]*People v. Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694].
[28]*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927].
[29]*Horwich v. Superior Court*, *supra*, 21 Cal.4th at page 276.
[30]*R. A. V. v. St. Paul* (1992) 505 U.S. 377, 380 [112 S.Ct. 2538, 2541, 120 L.Ed.2d 305].

content discrimination is such that there is 'no realistic possibility that official suppression of ideas is afoot,' regulation of proscribable speech will survive constitutional scrutiny. [Citation.]

"The high court concluded the St. Paul ordinance was constitutionally defective because, although facially limited to the category of proscribable fighting words, in practical operation it applied only to fighting words that insult or provoke violence on the basis of race, color, creed, religion or gender. [Citation.] The St. Paul ordinance thus went beyond mere content discrimination to actual viewpoint discrimination. [Citation.] The ordinance handicapped those *advocating* racism, sexism or other prohibited bias, while imposing no comparable stricture on *opponents* of those views. [Citation.]"[31]

Our Supreme Court, in *In re M.S.*, found section 422.6 dissimilar in crucial respects to the St. Paul ordinance invalidated in *R. A. V.* It explained: "The latter proscribed the use of '*a symbol, object, appellation, characterization or graffiti . . .* which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others' [citation] on the basis of the enumerated characteristics—under any analytical framework, a direct regulation of the content of expression. Section 422.6, subdivision (a), by contrast, prohibits willful 'injur[y], intimidat[ion], interfer[ence] with, oppress[ion], or threat[s]' against another person in the exercise of a constitutional or statutory right, by force or threat of force, because of the person's race or other protected characteristics—activities, in themselves, clearly falling closer to the conduct end of the expression/conduct continuum, even though in some circumstances they may be intended to convey some expressive content. Subdivision (c) of section 422.6, moreover, insofar as it may regulate speech, delimits punishable speech to the proscribable category of true threats, as discussed above."[32]

*In re M.S.* did not deal with subdivision (b) of section 422.6. Nonetheless, the court's rationale applies equally to it as the acts it proscribes are activities "clearly falling closer to the conduct end of the expression/conduct continuum."[33] In addition, it is untenable that conduct such as vandalism is protected by the First Amendment merely because those engaged in such conduct intend thereby to express an idea.[34] The statute is directed at

---

[31]*In re M.S., supra,* 10 Cal.4th at pages 720-721.
[32]*In re M.S., supra,* 10 Cal.4th at page 721.
[33]*In re M.S., supra,* 10 Cal.4th at page 721.
[34]*Texas v. Johnson* (1989) 491 U.S. 397, 404 [109 S.Ct. 2533, 2539-2540, 105 L.Ed.2d 342].

regulating conduct that is unprotected by the First Amendment.[35] In *Wisconsin v. Mitchell*, the defendant assaulted a victim based on his race. The physical assault was not "by any stretch of the imagination expressive conduct protected by the First Amendment."[36]

In arguing that the words which he wrote on the classroom door and music building did not constitute a credible threat of violence, appellant acknowledges that, had the words been written on personal or real property belonging to the victims, the victims would have been attacked personally and they would reasonably be expected to fear that harm would follow. Because the words were written on public property, however, he contends they were nothing more than graffiti. However, as discussed above, the trial court properly found the property was that of the victims.

The record establishes that the word "Nigger" on the door of the school's only African-American teacher carried with it a violent connotation. The word produced a sense of apprehension, terror, and fear in the teacher. The even more descriptive words "Kill the Niggers," written on the music building where a number of African-American students gathered, were reasonably interpreted as a direct, violent threat to those students.

 Appellant has failed to establish that, as interpreted by the trial court, the statute is overbroad in violation of the First Amendment.

3. *The court did not err in finding appellant had the specific intent to intimidate the victims or to interfere with their civil rights.**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Judgment affirmed.

Ardaiz, P. J., and Harris, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 2001.

---

[35]See, e.g., *Wisconsin v. Mitchell* (1993) 508 U.S. 476, 487 [113 S.Ct. 2194, 2201, 124 L.Ed.2d 436] ("But whereas the ordinance struck down in *R.A.V.* was explicitly directed at expression [i.e., 'speech' or 'messages'] . . . the statute in this case is aimed at conduct unprotected by the First Amendment").

[36]*Wisconsin v. Mitchell, supra*, 508 U.S. at page 484 [113 S.Ct. at page 2199].

*See footnote, *ante*, page 718.