[No. H011813. Sixth Dist. May 9, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER SCOTT MacKENZIE, Defendant and Appellant.

1260

COUNSEL

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

■■■■■■■■■■■■■■■

**OPINION**

**WUNDERLICH, J.—**

### I. Statement of the Case

Defendant Alexander Scott MacKenzie appeals from a judgment entered after a jury found him guilty of a "hate crime," i.e., brandishing a firearm for the purpose of interfering with the civil rights of Michael Watts because of his race, color, ancestry, or national origin. (Pen. Code, §§ 417, subd. (a)(2), 422.7.[1]) The jury also found him guilty of brandishing a firearm (§ 417, subd. (a)(2)), battery upon a peace officer performing his duties (§§ 242, 243, subd. (b)), resisting an executive officer (§ 69), and falsely identifying himself to a peace officer (§ 148.9). In addition, the jury found true an allegation that defendant personally brandished a firearm. (§§ 667, 1192.7.)

On appeal, defendant claims the "hate crime" statute—section 422.7— violates his constitutional rights to free speech, due process, and equal protection. He further claims his attorney's failure to seek suppression of evidence denied him effective assistance of counsel. Finally, he claims the court erred in excluding important defense evidence, misinstructing the jury about Michael Watts's constitutional rights, and failing to instruct on the lesser related offense of resisting arrest.

We find no merit to these claims and affirm the judgment.

### II. Facts

### A. The Prosecution

Betty and Michael Watts and their three children are African-American. About 7 p.m., on April 26, 1993, Betty and Michael Watts were sitting in their car in front of their duplex at 1379 Essex Way, in San Jose. Two of their children were on the front lawn; the third was in the house.

At that time, defendant, who is Caucasian, drove up next to the Wattses' car and stopped so close Betty could not open her door. He stared at her, and so Betty opened her window and asked, " 'May I help you?' " Defendant replied, " 'To hell, fuck no[,]' " and then, " 'Oh, fucking no, you black bitch, I am sick of you mother fucking bozo niggers.' " He continued, saying, " 'This is my fucking neighborhood, I am sick of you fucking bozo niggers.' " Trying to calm defendant down, Betty said, " 'If you have a problem

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

with me or my children or anything, you can talk to me, you know, I have been living here for six months. I don't really know you or anything, but if you have any problems with us, you can talk to me about it[.]' "

Michael Watts cautioned his wife against saying anything to defendant, who he said was " 'crazy.' " He got out of his car and told defendant, " 'You can't talk to my wife like that. Don't you see my children out here? What is your problem?' " Defendant replied that he had no problem with the children but that " 'I am sick of you niggers' " and " 'I want you out of my neighborhood.' " Michael answered, " 'We live here, too[,]' " whereupon defendant said, " 'Fine. We can deal with it right now.' " Michael told his wife to get the children into the house and instructed his daughter to call "911."[2]

Defendant drove off and parked next to a fire hydrant about 44 feet away on the wrong side of the street. As Betty entered the house, defendant got out of the car, retrieved a pistol from the trunk of his car, and pointed it at Michael. Defendant then put the gun in his waistband and disappeared down the walkway to the duplexes at 1365 and 1367 Essex Way. The latter belonged to defendant's mother. Michael retreated into his house. Betty was frantically reporting the incident to the "911" operator. Michael spoke to the operator also.

A short time later, Michael went back outside only to find defendant standing two feet from the front door. They engaged in a heated discussion, some of which was captured on a tape of the "911" call. Michael called defendant a "racist," a "coward," and a "faggot." As the police arrived, Michael said, " 'You are going to jail. The police are here now.' " Defendant dropped a set of keys on the ground and started walking away. Watts pointed him out to Officer Moses Barreras of the San Jose Police Department.

Officer Barreras approached defendant by the gate between 1379 and 1373 Essex Way and pat-searched him. Defendant asked, " 'Can't a white man welcome his black neighbors into the neighborhood?' " Barreras told him to relax and that he was simply making sure he had no gun. Defendant replied, " 'I see what's happening here. You believe the nigger. I don't have a gun. I was only trying to welcome them and make them feel at home.' " Barreras asked if he had a gun and where he left it. Defendant said, " 'That "nigger" is making it up. I don't have a gun, and if you want, search my car.' "

Using one of the keys defendant had abandoned, Barreras opened and searched the car. In the passenger area, he found a .45-caliber ammunition

---

[2]A tape of the "911" call was played to the jury and a transcript admitted into evidence without objection.

clip and a wallet containing two driver's licenses bearing defendant's picture. One was issued to Ralph Preston Collins at 1367 Essex Way, the other to Michael Paul Davis at P.O. Box 1428, Campbell. Defendant said his name was Davis. A registration check revealed that defendant's car was registered to Ralph Preston Collins at 1359 Essex Way, across the street from 1367. In the trunk of the car, Barreras found another .45-caliber ammunition clip.

Barreras arrested defendant and placed him in a patrol car. Through the open window, defendant yelled, " 'Nigger bitch, you're dead.' " A short time later, he scolded Barreras, saying, " 'We got ourselves—ourselves a nigger lover. You are just as fucked as those fucking nigger dope dealers from Oakland. Fucking nigger bitch is dead[.]' "

Meanwhile, Officers Greg Simmons and James Hagan knocked on the door of 1367 Essex Way. Robert MacKenzie, defendant's brother, came out. He looked at defendant and then said he had never seen him before in his life and that he did not live there. Defendant yelled, " 'I'm a transient. I don't live here.' " However, when informed that defendant had a key to the residence, Robert said nothing more.

Simmons also spoke to Lorraine Shackelford, who lived at 1359 Essex Way, the registered address of defendant's car. This interview led Simmons to believe defendant lived at 1367 Essex, as suggested by the "Collins" driver's license. Thereafter, defendant consented to a search of 1367 Essex Way. Using the key, Simmons entered. Underneath the living room couch, concealed by the couch skirt, police found a loaded .25-caliber semiautomatic pistol. There was dust and debris under the couch, but the gun was clean. Michael Watts identified the pistol, which was registered to defendant.

Officer Barreras transported defendant to the police preprocessing center. En route, defendant said, " 'Hey, nigger lover, you can't protect them. You guys, San Jose Police Department, the nigger protectors. I guess since you love them, you are going to beat me up[.]' " He also said, " 'You know what I hate more than niggers? Nigger lovers. You fucked up, man. You are going to pay for this, nigger lover. [¶] Hey, nigger lover, you are going to pay like this—those L.A. cops, but at least I respect them since they beat a nigger[.]' "

When they arrived at the center, defendant spit on Barreras's leg and said, " 'Nigger lover, you are going to die, esse.' " Barreras pushed defendant's head down to prevent him from spitting again. With Officer Hagan's help Barreras dragged defendant into the center. Barreras strip-searched defendant and smelled alcohol. Defendant resisted fingerprinting and the taking of

a blood sample and appeared ready to bite Barreras so the officers had to use force against him. Analysis revealed a blood-alcohol content of .21 percent.

Thereafter, Barreras took defendant to the Santa Clara County jail. Along the way, defendant said, " 'You are going to die, mother fucker' " and " 'If I don't do it, my brother will.' " At the jail, defendant and his brother Robert were momentarily together in a hallway.[3] Defendant threatened Barreras, saying, "[T]here's the fucker who is going to pay. . . . Ten, twenty years, it doesn't matter, I will get you . . . ." Robert added, " 'If he doesn't I will. It ain't over yet. You fucked with the wrong family. You cops will pay for this.' "

## B. *The Defense*

Lorraine Shackelford, a neighbor and friend of defendant, testified that when she spoke to defendant between 4 and 5 p.m. on the day of the incident, he was drunk.

Thomas Howard, Betty Watts's boss at the Pizza Hut, testified that she was late for work on that day, left early, and seemed upset about something.

## III. *Constitutionality of Section 422.7*[4]

## A. *Free Speech*

Defendant contends that section 422.7 violates his First Amendment right to free speech because it punishes the expression of unpopular but protected political beliefs and ideas and has a chilling effect on speech by third parties.

In *In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1742-1753 [17 Cal.Rptr.2d 291], this court concluded that section 422.7 did not violate the First Amendment. Later, in *Wisconsin* v. *Mitchell* (1993) 508 U.S. __ [124 L.Ed.2d 436, 447-448, 113 S.Ct. 2194, 2201], the United States Supreme Court reached the same conclusion concerning Wisconsin's similar "hate crime" statute. The high court also rejected defendant's argument that the

---

[3]Robert had been arrested when the gun was found. He was tried along with defendant but acquitted of resisting an officer and wrongful possession of a firearm.

[4]Section 422.7, as it read in 1993, permitted a misdemeanor to be punished as a felony "if the crime is committed against the person or property of another for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him or her by the constitution or laws of this state or by the Constitution or laws of the United States and because of the other person's race, color, religion, ancestry, national origin, disability, gender, or sexual orientation . . . ." (Former § 422.7, Stats. 1991, ch. 607, § 6; Stats. 1991, ch. 1184, § 2.5.)

statute impermissibly chills First Amendment rights. (*Id.* at p. ___ [124 L.Ed.2d at pp. 447-448, 113 S.Ct. at pp. 2201-2202].) For the reasons stated in those cases and because defendant raises the issue "only to preserve it for review by the California Supreme Court[,]" we reject defendant's claim without further discussion.

### B. *Vagueness*

■ Defendant contends that section 422.7 is void for vagueness and thus violates his right to due process "because it does not adequately inform anyone of what behavior is prohibited."

In *In re Joshua H., supra,* 13 Cal.App.4th 1734, we rejected a similar vagueness claim because the statute had been narrowly construed in *People v. Lashley* (1991) 1 Cal.App.4th 938, 947 [2 Cal.Rptr.2d 629], to require proof of a specific intent to deprive an individual of a right secured by federal or state law. (See *Screws* v. *United States* (1945) 325 U.S. 91, 101 [89 L.Ed. 1495, 1502-1503, 65 S.Ct. 1031, 162 A.L.R. 1330].) " 'This does not mean, however, that the prosecution must show that the defendant acted with knowledge of particular provisions of state or federal law, or that the defendant was even thinking in those terms. It is sufficient if the right is clearly defined and that the defendant intended to invade interests protected by constitutional or statutory authority.' " (*In re Joshua H., supra,* 13 Cal.App.4th at p. 1742, quoting *Lashley, supra,* 1 Cal.App.4th at p. 949.)

Defendant claims that the passage from *Lashley* quoted above renders the specific intent requirement meaningless. He asserts that intent can be established simply by proving "the defendant deprived the victim of the 'right to be free of crime.' " Thus, the narrow judicial construction, in effect, collapses the determination of the specific intent required by section 422.7 into the determination of mens rea for the underlying offense.

Defendant's complaint about the practical effect this passage has on proving a "hate crime" does not suggest that as construed, section 422.7 "punishes without warning an offense of which the accused was unaware." (*Screws* v. *United States, supra,* 325 U.S. at p. 102 [89 L.Ed. at p. 1503].) In other words, regardless of whether it is a simple matter to prove the necessary intent, section 422.7 requires it and thereby provides adequate notice of what conduct is proscribed.

### C. *Equal Protection*

■ Finally, defendant contends that section 422.7 denies him equal protection under the law. He argues that the statute distinguishes between

"similarly situated" criminal defendants solely on the basis of their motivation and beliefs. He claims this distinction is constitutionally impermissible because it is irrational and not reasonably necessary to deter racially motivated violent crimes.

Although courts in other jurisdictions have rejected similar claims (see, e.g., *State* v. *Beebe* (1984) 67 Ore.App. 738 [680 P.2d 11, 13]; *People* v. *Grupe* (1988) 141 Misc.2d 6 [532 N.Y.S.2d 815, 820]), California courts have not addressed an equal protection challenge to section 422.7. We do and reject it.

■ The constitutional guaranties of equal protection deny states "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the statute." (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251]; *People* v. *Leung* (1992) 5 Cal.App.4th 482, 494 [7 Cal.Rptr.2d 290].)

To succeed on an equal protection claim, one must show that "the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549], italics in original.) In determining if such is the case, we focus on the distinction between groups drawn by the statute and, applying the appropriate level of judicial scrutiny, decide whether the distinction is legally justified. (See *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 798, fn. 19 [187 Cal.Rptr. 398, 654 P.2d 168].) The propriety of the distinction between groups determines whether they are "similarly situated."

The first step in the analysis is to decide the appropriate level of judicial scrutiny. (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 798.) "Statutes . . . will receive differing levels of scrutiny depending upon the nature of the distinctions they establish. Legislation which creates a suspect classification or impinges on the exercise of a fundamental right is subject to strict scrutiny and will be upheld only if it is necessary to further a compelling state interest. All other legislation will satisfy constitutional requirements if it bears a rational relationship to a legitimate state purpose." (*People* v. *Silva* (1994) 27 Cal.App.4th 1160, 1167 [33 Cal.Rptr.2d 181]; see *Board of Supervisors* v. *Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913 [13 Cal.Rptr.2d 245, 838 P.2d 1198]; *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at pp. 798-799.)

■ Defendant claims that section 422.7 impermissibly impinges on the fundamental right to have and express bigoted thoughts and beliefs, a right

protected by the First Amendment. Accordingly, he suggests that we must apply the strict scrutiny standard. We disagree.

Since it has already been held that section 422.7 does not directly violate a defendant's First Amendment rights, it appears to follow as a matter of law that it does not "impinge" on a defendant's fundamental right to express ideas protected by the First Amendment and thereby trigger strict judicial scrutiny. However, even if the statute had not as yet directly passed muster under the First Amendment, we would still reach the same conclusion.

Although section 422.7 punishes only violent conduct, the United States Supreme Court, considering a similar statute, did observe that the underlying reason for the punishment is the defendant's discriminatory motive in selecting the victim, that is, his or her constitutionally protected bigoted thoughts. (*Wisconsin* v. *Mitchell, supra,* 508 U.S. ___ [124 L.Ed.2d at pp. 444-445, 113 S.Ct. at p. 2199].) Thus, as the People here concede, "arguably the statute interferes with bigoted beliefs protected by the First Amendment."

■ Nevertheless, "not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny doctrine." (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 47 [157 Cal.Rptr. 855, 599 P.2d 46].) Both the United States and California Supreme Courts have recognized that "[w]hen the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied." (*Ibid.*) The doctrine is applied "only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right . . . ." (*Ibid.,* and cases cited therein.)

■ Section 422.7 does not directly or specifically regulate thoughts or speech, but rather "acts of violence intended to interfere with the victim's protected rights." (*In re Joshua H., supra,* 13 Cal.App.4th at p. 1746.) ■ Obviously, some peaceful conduct is so expressive of ideas that like speech it is entitled to First Amendment protection. (See *In re Joshua H., supra,* 13 Cal.App.4th at pp. 1746-1747 [giving as examples flag and draft card burning, peaceful demonstrations and picketing, and wearing armbands].) However, "[t]he First Amendment does not protect violence." (*NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 916 [73 L.Ed.2d 1215, 1238, 102 S.Ct. 3409]; See also *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 628 [82 L.Ed.2d 462, 478, 104 S.Ct. 3244] ["[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection"].)

■ Moreover, the violent conduct proscribed by section 422.7 is not "sufficiently imbued with elements of communication to be labeled

'speech.' " (*In re Joshua H., supra,* 13 Cal.App.4th at pp. 1746-1747.) In other words, by itself violent conduct motivated by bigoted beliefs has little inherent capacity to *communicate* those beliefs. To an observer, such conduct whether against intentionally or randomly selected victims would look the same. Consequently, although section 422.7 eliminates the use of violent conduct as a possible vehicle to express protected beliefs, its elimination does not represent the sudden loss of potentially expressive forms of conduct. On the contrary, existing penal statutes have already eliminated violent conduct regardless of its motivation from the realm of permissible conduct. In our view, therefore, section 422.7 has no "real and appreciable impact on" and does not cause "a significant interference with" one's fundamental right to hold or communicate protected ideas and beliefs. (*Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d at p. 47.) Thus, we conclude that the distinction drawn by the statute between random and bigoted perpetrators of violent conduct is not subject to strict judicial scrutiny but violates the equal protection guaranty only if it is not rationally related to a legitimate governmental interest.

In *In re Joshua H.,* we reviewed numerous studies and reports concerning the incidence of hate crimes across the nation, which revealed that such crimes are "at an 'all-time high' " and "more serious than conventional crimes"; the injuries inflicted have "a more debilitating effect on the victim and on members in the victim's community than does conventional crime"; and the injuries are also "more severe" due in part to the fact that hate crimes are more likely to be committed by strangers and multiple offenders. (*In re Joshua H., supra,* 13 Cal.App.4th at p. 1748, fn. 9.) We also noted that California's hate crime legislation was specifically enacted because of the increase in such offenses and the inadequacy of existing laws to deal with it. (*Ibid.*) We opined that "the government has a *legitimate and even compelling* interest in distinguishing between acts of violence randomly committed and acts of violence committed because the victim is a member of a racial, religious or other protected group." (*In re Joshua H., supra,* 13 Cal.App.4th at p. 1751, italics added; see *Wisconsin* v. *Mitchell, supra,* 508 U.S. at p. __ [124 L.Ed at pp. 446-447, 113 S.Ct. at p. 2201]; see also *R.A.V.* v. *St. Paul* (1992) 505 U.S. 377, 392-393 [120 L.Ed.2d 305, 324-325, 112 S.Ct. 2538, 2549] [recognizes as "compelling" the state interest in ensuring rights of groups subject to discrimination].)[5]

---

[5]In *Wisconsin* v. *Mitchell, supra,* 508 U.S. at p. __ [124 L.Ed.2d at pp. 446-447, 113 S.Ct. at p. 2201], the state and its amici noted that "bias-motivated crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest. [Citations.]" The court opined that "[t]he State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases. As Blackstone said long ago,

We consider our discussion in *Joshua H.* persuasive and dispositive on whether the distinction drawn by section 422.7 is legally justified. Specifically, we find the statute rational and reasonably related to legitimate and compelling state interests in both curbing hate crimes and providing protection against the special harms they inflict on individual victims, their communities, and society at large.[6] It follows that perpetrators of violent acts who select their victims because of their status and those who select their victims randomly are *not* "similarly situated." Thus, we hold that section 422.7 properly punishes the discriminatory violent offender more harshly than the random violent offender.

### IV. *Assistance of Counsel*

■ Defendant contends he was denied effective assistance of counsel in that his attorney failed to move to suppress the pistol found by police under the couch in his mother's house.

■ Both the state and federal Constitutions guarantee criminal defendants the right to effective assistance of counsel, which generally means " 'the reasonably competent assistance of an attorney acting as [a] diligent conscientious advocate. . . .' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], citation omitted; U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052].)

To establish ineffective assistance of counsel, defendant must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's unreasonable conduct, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine our confidence in the outcome. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1252 [278 Cal.Rptr. 640, 805 P.2d 899]; see *Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698].)

Where, as here, a claim is based on trial counsel's failure to make a motion, a defendant must prove not only the absence of a reasonable tactical explanation for the omission but also that the motion or objection would have been meritorious. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 876 [268 Cal.Rptr. 802, 789 P.2d 983].)

---

'it is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of public safety and happiness.' [Citation.]"

[6]Given our discussion of the purpose and need for section 422.7 in *Joshua H.* and the statute's narrow proscriptive focus on violent conduct that is already unlawful, we agree with the People, who claim that even if the applicable standard of review were "strict scrutiny," section 422.7 would still pass muster.

■ Defendant claims counsel could have had no possible tactical reasons for failing to move to suppress the pistol. He acknowledges that Officer Simmons testified that defendant gave his consent to search his mother's house. However, he argues, in effect, that the evidence adduced at trial establishes as a matter of law that defendant did not have the authority to consent to the search and the police could not reasonably have relied upon defendant's apparent authority to give consent. We disagree.

■ In determining whether the police reasonably relied on a suspect's apparent authority to give consent, we ask whether the facts available to the officer at the moment would warrant in a person of reasonable caution a belief that the consenting party had authority over the premises. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 188 [111 L.Ed.2d 148, 161, 110 S.Ct. 2793].)

■ ■ The record here discloses that defendant told police that he was just trying to "welcome" the Wattses to the neighborhood and make them feel "at home." The keys defendant abandoned opened his car, which he invited the police to search. Inside the passenger compartment and trunk, police found ammunition clips. They also found two driver's licenses. One bore his likeness, the name Ralph Preston Collins, and the address of 1367 Essex Way. Defendant's car was registered to Collins at 1359 Essex Way, across the street. At *that* address, Officer Simmons spoke with Lorraine Shackelford. After speaking to her, Simmons believed defendant lived at 1367 Essex Way, as suggested by the "Collins" driver's license. Defendant consented to a search of that address, and his keys included one that opened the door.

In our view, this evidence amply supports both a finding that defendant actually consented to the search and that the officers reasonably believed in and relied upon defendant's apparent authority to give consent. ■ Given the facts to which the officers would testify, we believe defense counsel could reasonably have decided that there was no reasonable possibility of prevailing if he made a motion to suppress. Indeed, we agree with this assessment.

■ Defendant, however, notes that he denied living in the neighborhood, Robert MacKenzie, whom police knew lived at the house, told them that defendant did not live there, and when Robert exited the house, he locked the door behind him and told the police officers not to enter. He argues that these facts conclusively render reliance on defendant's consent unreasonable. This argument is meritless.

When Robert told Officer Barreras " 'I have never seen [defendant] before in my life,' " defendant said, " 'I'm a transient. I don't live here.' " However,

given defendant's self-proclaimed purpose of "welcoming" the Wattses to the neighborhood, and the fact that he possessed a key to the residence and a license with the address on it, and consented to the search, it was reasonable for police to distrust and disregard both Robert's and defendant's statements as intentionally misleading. Moreover, given defendant's key and express consent, the fact that Robert locked the door of the house and told the officers not to enter does not suggest that defendant did not have joint access and control of the premises.

 In sum, defendant has failed to establish that counsel's failure to challenge the search could not have been a reasonable tactical choice and/or that such a challenge if brought would have been successful. Under the circumstances, therefore, we reject his claim of ineffective assistance of counsel.

## V. *Exclusion of Evidence*

 Defendant contends the trial court erred in excluding the proffered testimony of Thomas Howard, manager of the Pizza Hut where Betty Watts worked. According to defense counsel, Howard would have said that whenever he spoke to Betty Watts about her inadequate job performance, Michael Watts would later call him a "white suprem[aci]st," a "white faggot," and a "white coward." The trial court considered Watts's comments irrelevant because defense counsel could not establish that they were made *before* defendant's confrontation with Watts.

Defendant argues that regardless of when uttered, Watts's epithets to Howard were relevant to Watts's credibility, in that they revealed a prejudice against Caucasians and were inconsistent with Watts's testimony that he had no such prejudice. Defendant further argues that evidence of Watts's bias was relevant to show that *Watts*, not defendant, started the confrontation. He claims that the exclusion of Howard's testimony violated his constitutional right to confront and cross-examine *Watts* and thus the trial court's error is subject to the *Chapman*[7] harmless-beyond-a-reasonable-doubt standard of review. Alternatively, however, he claims the error is reversible under the general *Watson*[8] harmless-error test.

We agree that the relevance of Howard's proposed testimony did not depend on whether Watts's comments to Howard were made *before* the confrontation with defendant. Evidence of statements inconsistent with trial

[7]*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].
[8]*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

testimony and indicative of bias is relevant on the issue of credibility regardless of when the statements were made. The People do not argue otherwise.[9] Nevertheless, we conclude that the exclusion of this testimony does not compel reversal.

We first observe that "white supremacist" is not a racial slur, indicating the speaker's prejudice against Caucasians. Rather hurling the cliché is a specific way of accusing someone else of being prejudiced against people of color. Thus, Watts's alleged use of the phrase against his wife's boss would not so much suggest that *Watts* is racially prejudiced as to reveal his anger toward Howard based on a belief, reasonable or unreasonable, that Howard's complaints about Betty Watts were a thin disguise for *his* racism.

We further observe that the phrases "white coward" and "white faggot" would strongly indicate an intent to insult Howard. The point of their sting is deprecation of character (cowardice) and sexual orientation (homosexuality). Certainly adding "white" to these derogatory words arguably reveals some racial animus toward Howard. However, in light of the context in which they were uttered, the insults are not strong evidence of a generalized prejudice against Caucasians, let alone a prejudice so powerful that for no other reason, Watts would precipitate a racial confrontation with defendant, then concoct a plan to have defendant falsely arrested and prosecuted for initiating it.

Nor do these epithets have a great tendency to impeach Watts's testimony that he does not "have a problem" with other races. Indeed, if he did, one would have expected it to surface verbally during the confrontation with defendant, which was based solely on race. However, Watts did not use racially pejorative names or make racially specific insults. On the contrary, Watts generally described him as a "racist," a "coward," and a "faggot."

We next point out that the purpose of establishing Watts's racial bias and impeaching his statement of racial tolerance was to suggest that Watts fabricated the testimony that defendant brandished a pistol, for only Watts testified that defendant did so.

Watts testified that defendant retrieved a pistol from the trunk of his car. After pointing it at Watts, defendant retreated toward the entrance to his mother's duplex. Shortly thereafter, defendant came onto the walkway of the Wattses' house. By that time, Betty had made a "911" emergency call, which

---

[9]The People argue only that the evidence could properly have been excluded under Evidence Code section 352. They acknowledge, however, that the court did not invoke its authority under this statute.

was taped. In the near hysterical exchanges between the "911" operator and the Wattses, Betty informed the operator that although she had not seen a gun, her husband told her defendant had one. Michael repeatedly told the operator he had seen defendant with a gun. Michael is also heard shouting at defendant about the gun.

Although defendant at that time denied having a gun, the police found a pistol registered to him underneath a couch in his mother's duplex. Its clean condition in relation to the dust and debris under the couch indicated to the police that it had recently been placed there. Police also found a magazine for a different caliber pistol in the trunk of defendant's car.

Defendant's pistol, which Watts identified at the time it was found, and evidence that it had recently been placed beneath the couch and that defendant kept weapons and related items in the trunk of his car supported Watts's statement on the tape that defendant possessed a gun, as well as his trial testimony that defendant retrieved a gun from his trunk and later retreated toward his mother's residence.

Moreover, Betty and Michael Watts both testified that defendant called them "bozo niggers" and told them he was "sick" of "you niggers," whom he wanted out of his neighborhood. This testimony was supported by the testimony of police officers, which reflected defendant's repeated use of "nigger" in referring to the Wattses, his angry statements about hating "niggers" and hating "nigger lovers" more, his threatening comment "Nigger Bitch, you're dead," and his cynical statements that he was only trying to welcome these black people to the neighborhood.

Given the evidence supporting critical aspects of Watts's testimony about defendant's conduct and statements, the inherent implausibility that the "911" call to the police was a racially motivated contrivance and that the Wattses' palpable emotional urgency on the tape was staged, and, finally, the evidence of defendant's aggressive racial animus toward African-Americans, we find it inconceivable that evidence of Michael Watts's epithets would have raised a reasonable doubt about the veracity of Watts's testimony that defendant brandished the very pistol found by the police. Thus, we conclude that under any standard of review, the exclusion of this evidence was harmless.

## VI. *Instructions*

### A. *Erroneous Definition of a Hate Crime*

The court instructed the jury as follows: "In order to prove [a violation of section 422.7], each of the following elements must be proved: [¶] One. A

person committed the crime of [e]xhibiting a firearm, to wit: violation of Penal Code section 417 [subdivision] (a)(2); [¶] Two. Such crime was committed against another's person; [¶] Three. The perpetrator of such crime did so with the specific intent to intimidate or interfere with the alleged victim's free exercise or enjoyment of any right secured to him by the constitution or laws of California or the United States, specifically, the right to be free from the threat of violence; [¶] Four. The perpetrator committed the crime because of the alleged victim's race, color, ancestry, or national origin; and [¶] Five. The perpetrator had the present ability to commit a violent injury to the alleged victim." (See CALJIC No. 9.95.)

Defendant claims this instruction is legally erroneous because section 422.7 does not protect " 'the right to be free of the [sic] threat of violence.' " If it did, he argues, then the specific intent requirement "has no meaning because all crimes which could be aggravated under [section 422.7] will always interfere with the victim's right to be free from violence or the threat of violence committed against his person . . . ." He opines that section 422.7 applies only to crimes committed for the specific purpose of interfering with "significant constitutional rights such as the right to vote, freedom of speech, assembly, and religion, and the right to a trial by jury." We are unpersuaded.

In 1976, the Legislature enacted Civil Code section 51.7, which at that time provided: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, or position in a labor dispute." (Stats. 1976, ch. 1293, § 2, p. 5778.) In 1987, the Legislature passed the Tom Bane Civil Rights Act, which not only enacted section 422.7 but also amended Civil Code section 51.7. (See Stats. 1987, ch. 1277, §§ 2 and 4, pp. 4544, 4546-4547.) Thus, in addition to the general presumption that the Legislature has existing law in mind at the time it enacts a new statute (Cumero v. Public Employment Relations Bd. (1989) 49 Cal.3d 575, 596 [262 Cal.Rptr. 46, 778 P.2d 174]), the specific history of section 422.7 indicates the Legislature was explicitly aware of the right provided in Civil Code section 51.7 when it proscribed violent conduct committed for the purpose of intimidating or interfering with a person's free exercise and enjoyment "of any right secured to him or her by the Constitution or laws of this state . . . ." (§ 422.7, italics added.)

The use of "any" is simple, clear, and unambiguous and neither needs nor permits judicial construction. (See Solberg v. Superior Court (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) Moreover, "[t]he plain

meaning of words in a statute may be disregarded only when that meaning is repugnant to the general purview of the act, or for some other compelling reason . . . ." (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140], internal quotation marks omitted.)

Both its plain meaning and legislative history reveal that section 422.7 was expressly intended to protect, among other things, the right to be free from "any" violence or threat of violence committed because of one's membership in a protected group. (See *People* v. *Lashley* (1991) 1 Cal.App.4th 938, 951 [2 Cal.Rptr.2d 629].) We disagree with defendant's suggestion that this view renders the specific intent requirement "meaningless." By implicitly incorporating Civil Code section 51.7, section 422.7 reaches *all* violent conduct committed against others because of their protected status. Doing so is hardly meaningless; rather it is the primary purpose of the statute. Although by incorporating section 51.7, the Legislature made it relatively easy to prove intent, doing so represents a decision well within the Legislature's power to make. Defendant does not suggest that this decision is constitutionally suspect.

### B. *Overbroad Enumeration of Rights*

In addition to the instruction on section 422.7, the court, over a defense objection, read the following constitutional provisions and statutes. "California Constitution, Article One, Section One, provides that: All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life, and liberty, acquiring, possessing and protecting property, and [pursuing] and obtaining safety, happiness, and privacy. [¶] Section 43 of the California Civil Code provides that: Every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations[.] [¶] Section 51.7 of the California Civil Code provides that: All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or [position] in a labor dispute."

 Defendant contends that the court's enumeration of rights rendered the basic instruction on section 422.7 overly broad. For example, he notes that Civil Code section 43 provides that "subject to the qualifications and restrictions provided by law" people have a right to be free from "personal insult." He points out that not all personal insults are unlawful: some may be protected speech. However, the court failed to provide the jury with any

guidance on this particular right. In all, he claims the court's additional instructions were confusing and probably mislead the jury.

Given the unspecified breadth of the statutory language used in section 422.7 (i.e., "any" state or federal constitutional or statutory right) and the wide variety of circumstances in which hate crimes can be committed, it may often be helpful to the jury for a trial court to elaborate on the rights of a particular victim that are implicated during an incident. We do not believe, however, that an exhaustive list of a victim's rights, whether factually relevant or not, should be read to the jury in any or every case. Moreover, we decline to prescribe an appropriate general list. We note, however, that defendant's concern about the qualified right to be free from insults in Civil Code section 43 is valid and illustrates that any elaboration by the court must be carefully considered, appropriate, and *complete*.

Here, as noted above, the court's basic instruction on section 422.7 specifically required the jury to find that defendant brandished a gun at Watts in violation of his "right to be free from the threat of violence." By so explicitly focusing the jury's attention and determinative process, the instruction, in our view, eliminated any real possibility the jury might have been confused and misled by the court's additional enunciation of rights. Indeed, the basic instruction rendered this enunciation superfluous.[10] Under the circumstances, therefore, the use of additional instructions was harmless, in that we do not find that they had any effect on the verdict.

## C. *Lesser Related Offense*

Defendant contends the trial court erred in refusing to instruct the jury on the crime of obstructing a police officer, in violation of section 148, subdivision (a), a lesser related offense to attempting to deter and/or prevent an officer from performing duties, in violation of section 69, the crime with which he was charged and of which he was convicted.

"Instructions on lesser offenses are required because a procedure which affords the trier of fact no option other than conviction or acquittal when the evidence shows that the defendant is guilty of some crime but not necessarily the one charged, increases the risk that the defendant may be convicted notwithstanding the obligation to acquit if guilt is not proven beyond a reasonable doubt." (*People* v. *Geiger* (1984) 35 Cal.3d 510, 520

---

[10]We consider it farfetched to find that in the absence of instruction on relevant "qualifications and restrictions provided by law" (Civ. Code, § 43), the jury concluded that defendant brandished the gun at Watts, decided that the right not to be insulted was absolute and then, despite the specific language in the basic instruction, convicted defendant based on his interference with Watts's right to be free from insults.

[199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].) "The right to instructions on *related* offenses exists only to enable the jury to determine fairly the issues presented by the evidence and in so doing to avoid any incentive to convict the defendant of a greater offense than that which he committed." (*Id.* at p. 531, italics added.)

Defendant points out that section 69 requires a specific intent to deter or prevent an officer from performing his or her duty, whereas section 148 requires only the willful resistance to, delay, or obstruction of an officer in the performance of his or her duties. At trial, defendant sought the lesser-related instruction because the evidence of his intoxication might convince the jury he lacked the specific intent required for the greater offense. If it did, the jury might still have thought defendant willfully resisted an officer. However, without the lesser-related instruction, the jury had only two options: convict him of the greater offense, despite his lack of specific intent, or let his conduct go unpunished.

The People claim that the trial court was not required to give the defendant's requested instruction.[11] They point out that lesser-related instructions need only be given when there is some evidentiary basis "other than unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged." (*People* v. *Geiger, supra,* 35 Cal.3d at p. 531.) They assert that although defendant's blood alcohol was .21 percent, there was *no* evidence of the effect of that alcohol on appellant's ability to formulate the intent to disrupt his booking. Thus, they argue there was no evidentiary basis for a lesser-related instruction and giving it "would have improperly invited an unexplainable, i.e., unreasonable, jury rejection of the prosecution's evidence." We are unpersuaded.

Besides the evidence of defendant's level of intoxication, Lorraine Shackelford testified that sometime between 4 and 5 p.m., defendant looked and acted intoxicated. On the "911" tape, both Betty and Michael Watts told the operator that defendant appeared "high" on something. Barreras testified that at the preprocessing center, he smelled alcohol on defendant. Taken together, this evidence was sufficient to support an inference that, because of his intoxicated state, defendant lacked the specific intent required by certain

---

[11]The trial court refused the instruction because the elements of the offenses are different: one offense is a felony and the other a misdemeanor, and the two statutes protect different societal interests.

The People concede, and we agree, that the trial court's reasons do not justify refusal to give the requested instruction. Neither the gravity of the offense nor overlapping elements are relevant considerations in determining whether to instruct on a lesser related offense. Moreover, in *People* v. *Farrow* (1993) 13 Cal.App.4th 1606, 1623 [16 Cal.Rptr.2d 844], the court concluded that differing " 'societal interest[s]' " was also not a relevant factor.

crimes defendant was charged with. Indeed, the court specifically pointed out those crimes and their requisite specific intents and expressly instructed the jury that it could consider evidence of defendant's intoxication in determining whether he harbored specific intent. Thus, contrary to the People's argument, it would not have been irrational for the jury to acquit defendant of the greater offense and convict him of the lesser related offense had there been an instruction on it.

The People alternatively claim that refusal to instruct on the lesser related offense was harmless. We agree.

 Erroneous refusal to give a lesser related offense instruction is harmless where the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. (*People* v. *Farrow*, *supra*, 13 Cal.App.4th at p. 1626.)

 Defendant was charged with a violation of section 422.7, based on an allegation that defendant brandished a firearm, in violation of section 417. Defendant was also charged with simple brandishing. The essential difference between the two crimes is that the hate crime requires that the brandishing be done with a certain specific intent, but simple brandishing does not. The court's instructions made this distinction clear and explicit. The court also informed the jury that defendant's intoxication could be considered in deciding whether defendant had the specific intent for the hate crime but was not relevant to the charge of simple brandishing.

The simple brandishing instruction focused the jury's attention on whether defendant had the requisite specific intent due to his state of intoxication. Moreover, it gave the jury an option other than acquittal if it found that defendant brandished the firearm but lacked specific intent: it could convict him of simple brandishing. Nevertheless, the jury convicted defendant of the hate crime. In doing so, it implicitly rejected his intoxication defense and found that he harbored specific intent. Indeed, in convicting defendant of giving false identification to a police officer, the jury also found that he had the requisite specific intent for that crime.

In our view, the jury's verdict on the hate crime represents a finding that defendant's intoxication did not affect his ability to possess specific intent and a considered rejection of his intoxication defense. We believe this finding renders harmless the failure to give defendant's requested instruction.

We recognize that the specific intent required for the hate crime is different from that required for deterring an officer. Thus, technically speaking, in reaching its verdict on the hate crime, the jury did not have to reject

the more particular claim that defendant did not have the specific intent *to deter an officer* because of his intoxication.

Nevertheless, the evidence indicated defendant was intoxicated from between 4 and 5 p.m., when Lorraine Shackelford saw him, through the booking process. There is *no* evidence defendant had anything to drink after police arrived and arrested him, and no evidence suggesting he was or became any more (or less) intoxicated between the time of the hate crime and the time he deterred police duties. Under these circumstances, it is inconceivable that a jury would have found defendant sober enough to intend a hate crime against Watts but a short time later too intoxicated to intentionally deter the officers from booking him. Indeed, during closing argument, defense counsel portrayed defendant's intoxication in an all or nothing way: defendant was drunk throughout the entire episode, from the confrontation with Watts to the booking process, and thus did not have the specific intent required for any of the crimes that took place.

Given our discussion, we find the jury essentially resolved defendant's intoxication defense, including the question that would have been posed by the requested instruction. Thus, we conclude that the trial court's failure to give the instruction was harmless.

### Disposition

The judgment is affirmed.

Cottle, P. J., and Mihara, J., concurred.

A petition for a rehearing was denied June 1, 1995, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 9, 1995.