Filed 4/11/13  In re M.S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>M.S.,<br><br>　　　Defendant and Appellant. | A136298<br><br>(Alameda County<br>Super. Ct. No. SJ1201928301) |

After a contested jurisdictional hearing, the juvenile court found that M.S. (appellant) committed first degree robbery.  (Pen. Code, § 212.5, subd. (a).)  Based on this finding, appellant was adjudicated a ward of the juvenile court and placed on probation with a maximum term of confinement of six years.  (Welf. & Inst. Code, § 602; Pen. Code, § 213, subd. (a)(1)(A).)  On appeal, appellant contends there is insufficient evidence that he aided and abetted the commission of the robbery.[1]  We affirm.

---

[1]　In his opening brief, appellant also asserted that the juvenile court erroneously set his maximum term of confinement at six years, five months.  Appellant subsequently withdrew this claim in his reply brief, conceding that his counsel confused the maximum term imposed for appellant with the maximum term imposed for a co-defendant.

# I. FACTS

## A. *Prosecution Evidence*

At approximately 7:30 a.m. on May 29, 2012, Yosan Gebrenarian was riding on a San Francisco Municipal Railway (Muni) 5 Fulton bus headed west on Market Street. Gebrenarian sat in a window seat on the driver's side of the bus, "a row . . . behind . . . the back doors." While sitting there, she read an article on her iPhone and listened to music through headphones. The bus stopped about ten minutes later, and a young black woman wearing a puffy coat got on, followed by four males: appellant, C.E., S.S.C., and another individual identified only as David. All four males wore hooded sweatshirts: David in grey, C.E. and S.S.C. in black, and appellant in purple. The young woman sat next to Gebrenarian and started "digging through her purse." Feeling a "little suspicious" about the young woman's actions, Gebrenarian put her headphones and phone in her bag.

About five minute later, the young woman stood up and walked towards appellant, who was sitting in the back of the bus. Appellant was on the passenger side of the bus in a rear-facing seat two rows from the back. S.S.C. sat across from appellant facing forward. The young woman sat next to appellant and said something to him. Appellant then switched seats with S.S.C.

Approximately five minutes later, the young woman returned to the seat next to Gebrenarian. The young woman started "digging through her purse again." Then, about a minute later, Gebrenarian felt something against her thigh. Gebrenarian realized the young woman was poking her with a gun. The young woman said to Gebrenarian, " 'Give me what you got.' " When Gebrenarian hesitated, the young woman said, " 'give me your phone.' " The young woman also told Gebrenarian " 'don't tell anybody. I'll kill you.' " Gebrenarian noticed the young woman look at a tall, thin, young, black man, who was wearing a black hooded sweatshirt and standing by the rear exit door of the bus. Fearing for her life, Gebrenarian got her phone from her bag and gave it to the young woman. After Gebrenarian handed over the phone, the young woman demanded Gebrenarian's bag. In response, Gebrenarian asked if the young woman wanted her books, as they were the only things left in her bag. At that point, the bus stopped and the

2

young woman ran out. Accompanying the young woman was a "huddle" of young, African-American men who had boarded the bus with her at Montgomery Street, including the tall, thin one in the black hooded sweatshirt. As the group got off the bus, Gebrenarian yelled out, " 'there's cameras.' "[2]

Sara Lancaster, an attorney, happened to be riding the bus that day and witnessed the following sequence of events. According to Lancaster, three or four young men "crowded" around Gebrenarian and the young woman. At least two of the males wore black hooded sweatshirts and one wore a purple hooded sweatshirt. They stood in a manner that "felt threatening." At least one of the males held onto the hand rail in way that "felt like an effort to trap someone in a seat." One of the standing males pulled the bus cord, causing the bus to stop at Powell Street. As the young woman ran off the bus, she had to "push" her way through the group of males, who were crowding the aisle. The group of males left quickly behind her.

The group of males looked back at the bus as they caught up with the young woman. One boy, who Lancaster described as "Asian," looked back while he was "just a few feet a way from the bus." The other boys looked back when they were about 17 feet away. They appeared concerned or nervous. One of the males put his arm on the young woman's shoulder as he caught up with her. When members of the group got close to the Bay Area Rapid Transit (BART), they started running.

Lancaster had been paying close attention to the young woman and the group of males—both on the bus and after they got off—because she had initially thought the young woman may have been a potential victim. As the group disappeared from her line of vision, Lancaster saw Gebrenarian in the front of the bus, telling the driver that she had just been held up at gunpoint. When it became clear that the bus driver was not going to call the police, Lancaster dialed 911 on her cell phone and handed it to Gebrenarian.

---

[2] The video footage from the bus was introduced and played at the jurisdictional hearing. On our own motion, we have augmented the record on appeal with this recording, along with the other exhibits from the jurisdictional hearing. (Cal. Rules of Court, rule 8.155.) We have viewed the recording, as well as the other exhibits admitted at the jurisdictional hearing.

At 7:45 a.m., San Francisco Police Officers Michael Lee and Calvin Lew were on Market Street just west of 7th Street, when they received a dispatch regarding a robbery involving one female and three males. Two of the males were described as wearing "dark clothing," and the third was described as wearing a "purple-hooded sweatshirt." As the officers drove east on Market Street, they noticed appellant, S.S.C., and C.E. walking south on Taylor Street. C.E. and S.S.C. wore black sweatshirts, and appellant wore a purple sweatshirt. The officers detained appellant, C.E., and S.S.C. on Market Street, between the Powell Street and Civic Center BART stations. Appellant complied with Officer Lee's request to "get up against the wall." As he was facing the wall, appellant told Officer Lee, " 'I have a BB gun.' " Officer Lee removed what he described as a "semiautomatic-style handgun" and he handed it to another officer who had arrived at the scene. The gun was black, and "resembled a real firearm with the exception of . . . an orange tip that's typically at the muzzle where a bullet would come out of a gun." Someone had "painted over" the orange tip, but some of the paint was coming off. Other than that, "it looked like a real gun."

Officer Lew recovered Gebrenarian's iPhone from S.S.C.'s pants pocket. Another officer searched C.E. and recovered "a couple of wallets," another iPhone, and a knife with a "folding knife" that was "a couple of inches" long.

About 15 minutes after the robbery, officers arrived at the bus. The officers took Gebrenarian a couple of blocks down and asked her if she could identify the suspects. Gebrenarian was able to identify the tallest one, who was wearing a black hooded sweatshirt. She said that one other individual "looked familiar," but she did not recognize the third person.

Officers also asked Lancaster to identify the three suspects. Lancaster said C.E.'s appearance was "consistent" with that of the Asian male she saw on the bus. As well, appellant's, and S.S.C.'s facial appearances, body types, and clothing were "consistent" with those of the black males Lancaster saw on the bus.

After waving his *Miranda* rights, appellant spoke with Inspector William Toomey at the police station. Appellant thought he was in trouble because someone he knew did

4

something "stupid" and because he possessed a BB gun. Appellant "change[d] the details of how he got on the bus and who he was on the bus with." His story contained several inconsistencies. Initially, he said that he was never on the bus. Rather, he said that he took BART from Oakland and exited at the Montgomery Street station, where he saw some friends getting off the bus. When Inspector Toomey suggested there were inaccuracies in his story, appellant admitted that he had been on the bus. Appellant said that he got on and off the bus alone and he met up with the individuals he was detained with once he got off the bus. He then told Inspector Toomey that he got on the bus alone at Montgomery, and a group of his friends were already on board. At first, appellant said that he sat in the last row of the bus on the right-hand side. When Inspector Toomey gave him time to reflect on his story, appellant said he sat in the second-to-last row. Appellant did not make any statements about changing his seat while on the bus. Appellant acknowledged seeing a robbery take place on the bus. He said it was a "stupid choice" and a "dumb decision" to exit the bus with the robbers.

Appellant said that when he was on the street, "someone" handed him the BB gun so he could take a look at it. He later told Inspector Toomey that he had had the BB gun on him all along; the gun was purchased for him by someone he knew. Appellant said that there were two BB guns on the day of the robbery, and the one he carried was not the one used by the robber. Appellant said the young woman had either fled with the other gun, or had given it to someone else.

**B.    Defense Evidence**

On May 29, 2012, appellant took BART to San Francisco to go to a recording studio with his friend L.R. Appellant left Oakland for San Francisco about 6:30 a.m. He exited BART at the Montgomery Street station and waited for a bus. He planned to take the bus to a liquor store on Powell Street to buy a "Swisher" cigarette to fill it with marijuana. He then planned to take a bus to Third Street to meet up with L.R. While at the bus stop, he saw S.S.C., C.E., David, and "some girl." Appellant did not know David, and he had never before seen the girl. Appellant had the BB gun with him because he wanted to shoot at targets with the gun. C.E. had purchased the BB gun for

5

him the previous day.  Appellant was aware that another gun had been purchased also, but he did know its location.  There was no discussion of a robbery.

Appellant sat in a "four-seater" facing the back of the bus, on the passenger side. S.S.C. sat across from appellant, and the girl initially sat "somewhere behind" them.  C.E. and David sat on the other side of the aisle.  The girl walked from the front of the bus and sat in the empty seat next to appellant.  She whispered something in appellant's ear. Appellant could not hear her because she spoke in a low whisper and the sound of the bus "overrode her whisper."  The girl then "mad[e] some kind of contact" with S.S.C.  As S.S.C. and the girl were talking, S.S.C. nodded to appellant, and they "just got up and switched" seats.

The girl then got up and moved to the driver's side of the bus and sat next to "a woman."  The woman "jumped out of fear."  Although appellant was initially unable to see the woman's face as she was facing forward, she twisted her torso and turned to the right.  Appellant could tell that something was wrong.  He turned his head away because he "didn't want to be a part of it all," and he did not want to see the robbery take place. He did not take out his gun and loan it to the girl.

About five or ten seconds later, C.E., S.S.C., and David stood up and started walking.  Appellant remained seated because he was waiting for his stop and he "didn't want to be part of [the robbery]."  One of the boys pulled the bus cord and stood up over the woman being robbed.  The bus stopped, and the girl ran off.  Appellant "figured" that since he was not with the girl, he could not get in trouble, so he got off the bus as well.

Appellant said he changed his story when he spoke with police because it was his first time at a police station and he was nervous.

## II. DISCUSSION

### A.     *Standard of Review*

Substantial evidence is evidence that is reasonable in nature, credible, and of solid value, from which a rational trier of fact could find the elements of a crime beyond a reasonable doubt. (*People v. Bolden* (2002) 29 Cal.4th 515, 553; *People v. Samuel* (1981) 29 Cal.3d 489, 505.) The same standard of appellate review is applicable in considering the sufficiency of the evidence in a juvenile proceeding as in reviewing the sufficiency of the evidence to support a criminal conviction. (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605; *In re Michael M.* (2001) 86 Cal.App.4th 718, 726.) In either case, we review the entire record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the fact finder could reasonably deduce from the evidence. (*People v. Bolden, supra,* 29 Cal.4th at p. 553.) If the evidence permits a reasonable trier of fact to conclude the charged crime was committed, the opinion of a reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Bean* (1988) 46 Cal.3d 919, 933; *In re Roderick P.* (1972) 7 Cal.3d 801, 808-809.) Where a verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its own evaluation of a witness's credibility. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

### B.     *Substantial Evidence Supports the Finding Appellant Aided and Abetted the Robbery*

Appellant contends there is insufficient evidence to support the finding that he aided and abetted the robbery. He argues that he was merely present at the back of the bus while the robbery was in progress. He points out that the evidence establishes possibly nothing more than that he was " just . . . along for the ride."

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v.*

7

*Beeman* (1984) 35 Cal.3d 547, 561; see *People v. Montoya* (1994) 7 Cal.4th 1027, 1038-1039.) Among the factors that may be taken into account when determining whether a defendant aided and abetted a crime are presence at the crime scene, companionship, and conduct before and after the offense. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5 (*Juan G.*).) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining a defendant's criminal responsibility. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell, supra,* 25 Cal.App.4th at p. 409; *Juan G., supra,* 112 Cal.App.4th at p. 5.)

The evidence in this case supports the reasonable inference that appellant knowingly and intentionally aided and abetted the robbery. Appellant armed himself with a realistic-looking semi-automatic BB gun before he boarded the bus with the woman who robbed Gebrenarian, and the three males who blocked her exit. Appellant sat with the three males in the back of the bus, a few rows behind Gebrenarian. Prior to robbing Gebrenarian, the young woman went to the back of the bus, whispered something in appellant's ear, and then sat down next to him. Appellant then traded seats with S.S.C., so that S.S.C. and the girl could talk. At this point, appellant was in a forward facing seat and able to see the row where the victim sat. After contacting appellant and S.S.C., the girl returned to her seat next to Gebrenarian and robbed her at gunpoint. As the girl robbed Gebrenarian, three males crowded around the seat, while appellant remained in a position to see everything that happened. He made no effort to stop the events unfolding before him. Rather, once the robbery was over he fled the scene with his companions. Given that the appellant boarded the bus with the girl who robbed Gebrenarian and that she briefly sat near him on the bus and whispered something to him, there was sufficient evidence to draw reasonable inferences that appellant gave the girl the gun used in the robbery. The juvenile court was not required to believe

8

appellant's story that the group actually was traveling with two guns and that his gun was not used in the robbery. (See *People v. Ochoa, supra,* 6 Cal.4th at p, 1206.)

Even if appellant committed no overt act during the course of the robbery, none was required. Rather, his presence could have given encouragement to his companions and acted as a deterrent to any resistance on the part of the victim. That is sufficient to make him a participant in the crime. "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense. ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal[,]' [[c]itation]," and extends to lookouts, getaway drivers, persons present to divert suspicion or give warning to anyone who seeks to interfere, and the like. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1463-1464.)

The facts in this case closely parallel those in *Juan G., supra,* 112 Cal.App.4th 1. There, Juan G. and Quincy D. approached the victim. Quincy spoke to the victim, pointed a knife at him, and demanded money. Juan stood close enough to touch the victim, and the victim felt threatened by him. When the victim complied, Quincy and Juan fled. They were subsequently found by police together. (*Id.* at pp. 3-4.) In his defense, Juan claimed he had not known Quincy had a knife or was planning to rob the victim. (*Id.* at p. 4.) The juvenile court sustained a juvenile petition against Juan alleging that he aided and abetted the robbery. (*Ibid.*) On appeal, the court rejected Juan's argument that he was nothing more than an unwitting and passive bystander. (*Id.* at p. 5.) The court relied on the fact that the minors approached the victim together; when Quincy demanded money at knifepoint, Juan was beside him; the victim felt intimidated by Juan; and after the robbery the minors fled together. (*Id.* at pp. 5-6.)

Also instructive is the case of *In re Lynette G.* (1976) 54 Cal.App.3d 1087 (*Lynette G.*). In that case, one teenage girl struck a woman and took her purse while Lynette G. and two other teenagers stood approximately five feet away. (*Id.* at pp. 1090-1091.) When the victim called out for help, the four young women fled. They were subsequently found and arrested together. (*Id.* at pp. 1091-1092.) Although there was no

indication Lynette G.'s presence was threatening to the victim, the court in *Lynette G.* nevertheless found that substantial evidence supported the finding that she had aided and abetted the robbery. (*Id.* at p. 1095.) Based on its review of the evidence, the court reasoned that, "[t]estimony by witnesses at the trial disclosed that [the minor] was present at the scene of the crime and had fled with the perpetrator and two others after the crime had been committed and was still in their company shortly thereafter. Although flight, in and of itself, may be explained by a desire merely to disassociate oneself from an unexpected criminal activity, the trial court was not required to adopt that view; it could, reasonably, have concluded that had [the minor's] flight been from fear of an unjustified charge of involvement, she also would have immediately disassociated herself from the other three girls." (*Id.* at p. 1095.) Accordingly, the court concluded: "On the record before us, we cannot say that the trial court erred in finding that [the minor] had aided and abetted the robbery of [the victim]." (*Ibid.*)

The facts that were present in *Juan G.* and *Lynette G.* are present in the instant case. Here, appellant, armed with a realistic-looking BB gun, boarded the bus with the woman who robbed Gebrenarian, and the three males who blocked her exit. They sat together in the rear of the bus, and the perpetrator whispered something into appellant's ear just prior to the robbery. As the girl robbed Gebrenarian, and the others males trapped Gebrenarian in her seat, appellant remained seated while the events were unfolding, and then got off the bus with his companions once the robbery was completed. His acts of fleeing the scene and remaining with his companions, who were in possession of Gebrenarian's stolen phone, as well as a knife, highlights his complicity in the robbery. (See *People v. Chagolla* (1983) 144 Cal.App.3d 422, 429.)

Appellant's reliance on *In re David K.* (1978) 79 Cal.App.3d 992 is misplaced. In *David K.,* victim Langley was seated in the driver's seat of his car in a San Francisco neighborhood when he saw three minors. (*Id.* at p. 997.) Two minors approached on the driver's side and one on the passenger side. (*Ibid.*) One of the minors, George, put a knife near Langley's neck and forced him to surrender his car and money. (*Ibid.*) George entered the car and drove away. (*Ibid.*) Langley saw the heads of two other

10

individuals in his car. (*Ibid.*) He indicated that all three individuals were of Latin descent and between 25 and 26 years old. (*Ibid.*) In contrast, David K. was a 17-year-old Caucasian. (*Id.* at p. 998.) Three hours after the robbery, police observed Langley's car in Yuba City. George and Salvador, who were of Latin descent, were in the front seat and David K. was in the rear seat. (*Id.* at p. 997.) David K. had no money on his person but Langley's wallet was between his legs. (*Ibid.*) The appellate court reversed an adjudication order because the juvenile court's findings were not supported by sufficient evidence. (*Id.* at p. 1001.) In so ruling, the court explained that "[t]he only evidence to connect the minor David with the robbery of Langley is the fact that three hours after the robbery, in a city some distance from the site of the robbery, David was found in the company of the identified robber in the stolen automobile with personal property of the victim being found in open view in the automobile. No cash proceeds of the robbery were found on David's person and the empty wallet, purse, and binoculars belonging to Mrs. Langley were in the back seat where David was seated. There is no evidence, however, that he was exercising any dominion or control over these articles. The situs of the articles as being in the back seat of the automobile where David was seated does not tend to establish that David was exercising any control over these articles. [¶] To draw an inference from these facts that David was one of the three persons at the site of the robbery three hours earlier in another city would amount to pure speculation. It is to be noted that Langley identified only the minor George as the actual perpetrator and gave a description to the police that all three persons involved were of Latin descent and were young adults. By no stretch of the imagination did appellant David, a Caucasian, fit into any of the categories." (*Id.* at p. 1000.)

The present case is distinguishable from *David K.* in several respects. First, video evidence and witness testimony reveal that appellant entered and exited the bus with the young woman who robbed Gebrenarian at gunpoint, along with the three males who blocked her seat. Second, the young woman sat next to appellant and whispered something to him just prior to robbing Gebrenarian at gun point. Third, shortly after the crime, appellant was apprehended with two of the males who blocked Gebrenarian's seat.

Fourth, officers found appellant in possession of a realistic BB gun, while his companions possessed Gebrenarian's phone, as well as a folded knife.  Finally, appellant admitted to observing his companions participate in the robbery and said his decision to get off the bus with them was "dumb."

Equally misplaced is appellant's reliance on *People v. Hill* (1946) 77 Cal.App.2d 287 (*Hill*).  In *Hill,* the defendant was asked by the principals to drive around to look for some girls.  (*Id.* at p. 291.)  After defendant was told to pull up to a nearby bar and wait inside the car, two of the car's occupants entered the bar and robbed the bartender at gunpoint.  (*Id.* at p. 288.)  Once they exited, they found the defendant asleep in the driver's seat.  (*Ibid.*)  At trial, the two men who robbed the bar exonerated the defendant, testifying that they asked him to drive around looking for girls and that they did not tell him they were going to rob a bar.  (*Id.* at p. 291.)  The appellate court held that the defendant's mere presence, without a showing of his knowledge of the perpetrators' plans was insufficient to show he aided and abetted the crime.  (*Id.* at p. 294.)

*Hill* is readily distinguishable from the instant case.  Here, appellant did not sleep through the robbery and his companions did not exculpate him.  Without again detailing the evidence, he boarded the bus with the perpetrator, briefly sat with her while she whispered something to him, and he admitted that he knew the robbery had taken place.  Once the crime was completed, appellant fled the bus with the perpetrators.  When apprehended by the police shortly thereafter, appellant was found carrying a realistic-looking BB gun, while in the company of the others males who had been on the bus and who possessed the victim's stolen phone, as well as a knife.  "Such conduct is a textbook example of aiding and abetting.  [Citations.]"  (*People v. Campbell, supra,* 25 Cal.App.4th at p. 409.)

Substantial evidence supports the juvenile court's true finding that appellant aided and abetted in the commission of the robbery.

### III. DISPOSITION

The jurisdictional and dispositional orders are affirmed.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.

13